## LOUISIANA *v.* MISSISSIPPI.

No. 8, original. Argument commenced and suspended, and cause referred to a Special Master, October 8, 1928. Submitted on defendant's exceptions to the report of the Special Master, January 5, 1931.—Decided February 2, 1931.

*Messrs. Gerard Brandon, Percy Saint,* Attorney General of Louisiana, *John Dale, Robert Ash, Philip Hough, John*

*Dale, Jr.,* and *L. D. Dale* were on the brief for the State of Louisiana.

*Messrs. George T. Mitchell,* Attorney General of Mississippi, *H. H. Creekmore, Pat Henry, Rufus Creekmore, E. C. Sharp,* and *Rush H. Knox* were on the brief for the State of Mississippi.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The bill seeks a decree locating and establishing a portion of the boundary line of Louisiana and Mississippi, between Willow Point and adjacent premises in the former, and lands in Township 9 North, Range 8 West, in the latter state, where the Mississippi River forms what is known as Albemarle Bend.

In 1823 the thread of the navigable channel of the river was the true boundary line, and is correctly located by surveys made by the Mississippi River Commission in 1823 and 1824. At that time the territory now in dispute was within Mississippi and consisted of an island (then known as Tullos Island, which lay to the east of the thread of the river and was separated from the Mississippi mainland by a chute) and certain portions of the mainland east thereof. Prior to 1882 the island was renamed "Island No. 98."

The complainant asserts:

That between 1823 and 1913 erosions occurred which ate away all of Tullos Island and large portions of the Mississippi shore;

That accretions attached to the Louisiana shore;

That the river, and consequently the interstate boundary line, gradually and imperceptibly moved eastwardly and northwardly a distance of five or six miles;

That the accretions to the Louisiana shore became the territory of complainant;

That in 1912–1913 the river suddenly changed its course, cut across the bar formed by the said accretions on the Louisiana side, and by avulsion formed a new channel to the west, severing from the Louisiana shore a large portion of the accretion theretofore formed;

That as the last change was by avulsion the boundary line remained and now is at the thread of the extreme easterly and northeasterly channel of the river as it was in 1912–1913.

The Mississippi River Commission surveyed the river in 1882, and admittedly its chart made from that survey correctly shows the shore lines and bar lines and other relevant data as of that year. A further survey was made by the Commission, and a plotting taken therefrom in 1894, and a similar survey and plotting shows the river as it was in 1912–13. These demonstrate that the river had moved to the eastward from its position in 1823, each survey placing it considerably east of its location at the time of the next earlier one.

The respondent avers:

That the complainant has failed to show how the change in the channel came about between the surveys of 1823–1824 and that of 1882;

That as complainant has the burden of showing that the change took place by accretion rather than by avulsion, and has failed to carry that burden, it can make no claim for the land added to the Louisiana shore prior to 1882;

That subsequent to 1882 the river above the point in controversy cut into the Louisiana bank above and along the northern border of Willow Point, was deflected in a northeasterly direction, so that instead of striking Tullos Island it curved around the head of what then remained of the island (as it is shown on the survey of 1882) and enlarged the chute between that island and the Mississippi shore, forming a new channel there;

That subsequently the old channel, which had run to the west of the island, filled up, and thereby the island became attached to the Louisiana shore;

That the new channel running to the north and east of what was left of Tullos Island added by accretion to the easterly side of the island and cut farther into the Mississippi shore until 1912–13, when the river suddenly abandoned the new channel and returned to the old 1882 channel;

That thereby what theretofore had been Tullos Island again became an island separated from the Louisiana shore, although greatly enlarged over its dimensions in 1882 by the accretions added to its easterly side.

As an additional and alternative defense Mississippi asserts that its title to the disputed territory cannot now be assailed because of long continued possession and exercise of sovereignty and dominion, with the acquiescence of Louisiana.

On the issues thus made testimony was taken before a commissioner, and was referred to Thomas G. Haight, a member of the bar of this court, as special master, with direction and authority to report his findings of fact, conclusions of law, and recommendations for a decree. He has filed his report, recommending a decree in accordance with the contentions of the complainant. The respondent has filed exceptions.

The parties are in agreement as to the applicable legal principles. The exceptions raise no questions of law, but go solely to the correctness of the master's fact findings and conclusions. We have, therefore, examined the proofs, consisting of documentary evidence and oral testimony, to determine whether the master's findings are in accord therewith. In brief he finds:

1. That the changes between 1823 and 1912–13 were by gradual erosion of the Mississippi shore and gradual accretions to the Louisiana shore, and not by avulsions.

2. That the change in 1912–13 was due to an avulsion.

3. That the accretions up to the avulsion of 1912–13 and thereafter, so long as the current flowed in the easterly channel as it was prior to the avulsion, became Louisiana territory.

4. That the avulsion of 1912–13 did not change the boundary line.

5. That Mississippi did not by possession or exercise of sovereignty or dominion acquire right or title to the disputed territory; and as a consequence of the foregoing,

6. That the present true boundary line is the middle of the navigable channel prior to the avulsion of 1912–13, as that channel was when the current ceased to flow therein by reason of the formation of the new channel by the avulsion of 1912–13, and the filling of the former channel.

. . There is no challenge of findings 2 and 4. The whole controversy revolves about the correctness of findings 1 and 3 as to the physical changes which actually took place, and finding 5 as to the exercise of dominion by the respondent. -

I. With respect to the physical changes which have taken place in the location of the Mississippi River, the proofs may conveniently be divided into two parts,— those which apply to the period prior to 1882, and those which have to do with that between 1882 and 1912.

It was impossible to procure much or very persuasive oral evidence as to conditions prior to 1882. The master had before him, however, the charts of the Mississippi River Commission of 1823–24 and of 1882, and plats from surveys made in 1866 and 1870. By comparing these and noting facts deducible from them, he concluded that the river moved eastward from its 1823 channel to its 1882 channel gradually and not by avulsion. He found that the Louisiana shore was eroded above Albemarle

Bend and extended to the eastward by accretions at Willow Point. He further found that while this was occurring the eastward sweep of the river gradually cut away the greater portion of Tullos Island. During all of this time the river remained of approximately the same width, thus negativing Mississippi's contention as to the possibility of the change in the channel being sudden and by avulsions of nature. His conclusions were also supported by the relative locations of sand bars and river banks at the dates of the successive surveys. In 1882 a towhead, so-called, had been formed on the sand bar created by the accretions to the Louisiana shore, which was named "Newman's Towhead" because the owner of the Louisiana mainland at the point from which the bar had made out was a man named Newman. On this towhead there had sprung up a growth of willow and cottonwood timber.

From an examination of the proofs and a checking of the processes of reasoning and deduction adopted by the master we are satisfied that his findings on this branch of the case are justified; and that the contention of Mississippi that he has relied upon mere inferences, which do not rise to the dignity of affirmative proofs, is not well founded.

A more serious controversy, complicated by conflicting oral testimony, is disclosed as to what occurred between 1882 and 1912. The complainant adduced proofs tending to show that the eastward and northeastward movement of the channel continued after 1882. These further tend to show that by 1894 all that was left of Tullos Island in 1882 had been washed away, and that the main channel of the river was in part where that island had formerly been and in part east of its location; that the eastward movement of the river and the direction of the current to the east eroded a substantial portion of the

former Mississippi mainland; that from 1894 to 1912 this movement eastward continued until whole sections of Township 9 North, Range 8 West, in Mississippi, had caved away; that in periods of high water in 1912 and 1913 the river overflowed the bar extending out from the Louisiana shore to Newman's Towhead and took a south-westerly course, cutting across the accretions theretofore formed and leaving the eastern portions of the bar, including the towhead, an island; that a portion of this new island occupied the location of what was formerly Tullos Island. Thus complainant claimed, that, prior to 1912, the old island had been washed away by the eastward progress of the river channel, and had been replaced by accretions along the westerly side of the river adjacent to Louisiana.

Respondent offered evidence tending to show that while the river reached the extreme easterly position averred by the complainant, it did so not by washing away Tullos Island and moving eastwardly over the former location of that island, but by swinging around to the north and east of that island, enlarging and scouring out the former chute or narrow channel between the island and the Mississippi mainland; that thereafter the river added by accretions to the eastern side of what was left of the island, and that the old channel to the west of it gradually filled up.

If the weight of the evidence is with the complainant, the territory in controversy belongs to Louisiana; if the contrary be found, the disputed territory, originally within the boundaries of Mississippi, so remains.

There is much conflicting testimony as to the location of the main channel between 1890 and 1912; as to whether Tullos Island was scoured away; as to the character of the soil and timber on the island; as to whether the alleged clay soil of the island disappeared and was afterwards replaced by a sand bar formed by accretion; as to

whether the original virgin timber which was on it fell into the river and disappeared with it, or in part still stands as mute evidence that the island was never entirely washed way.

Mindful of the fact that the special master did not see and hear the witnesses, we have felt it incumbent upon us to study the proofs, documentary and oral, to examine the deductions made therefrom, and thereby to test the stated conclusions. The preponderance of the evidence supports the master's finding that from 1882 to 1894 the river moved eastwardly, caving away Tullos Island along its western shore, until it had wiped out that island; that the continued eastward movement caved the Mississippi shore, at the same time adding to the accretions which had already formed on the Louisiana shore opposite Willow Point; and that the bar was continuous from the old high bank on the Louisiana side to the end of Newman's Towhead. Thus by 1912 an area five or six miles in length and several miles in width had been added to the Louisiana shore.

As matters stood in 1912 and 1913, the boundary line between the states was the thread of the navigable channel far to the eastward of the present channel. As above stated, there is no controversy as to what occurred in 1912–13. The river by a sudden avulsion made a short-cut to the west of Albemarle Bend, as it then was; and subsequently the channel in the old bend to the eastward of the new channel silted and filled until it entirely closed at the upper end. This sudden avulsion did not change the boundary line between the states.

II. It remains to discuss the proofs bearing upon the master's fifth finding. The survey of 1882 discloses that accretions attached to the Louisiana shore had at that time extended to the eastward so far as to cover a portion of the territory formerly belonging to Mississippi. The

1894 survey shows these accretions covering a much larger portion, and that of 1912–13 shows a still greater extension over former Mississippi territory. The Newmans, who lived on Willow Point, Louisiana, had a house about one hundred yards east of the 1824 mainland, between the levee and the stream, and just above Albemarle Bend proper. It must, therefore, have been built on accretions formed subsequent to 1824. It caved into the river in 1905. The master found that the possession of the Newmans extended at least to those accretions which had attached to the shore up to the time that their house was destroyed. The disputed territory is low alluvial land subject to overflow at times of high water and is not protected by levees or dikes. Upon portions of it cottonwood and willow timber has grown. The land is not fitted for cultivation or settlement except in a haphazard way. It took its name from the Newman family and was known as the "Newman Towhead." After the avulsion of 1912–13 severed a large portion of it from the Louisiana shore the successors in title of the Newmans leased the cut-off portion of it, lying to the eastward of the new channel, to one Towns. The lease described it as part of the Bell and Willow Point plantations, located in East Carroll Parish, Louisiana. It was occupied under the lease for six or eight years for the pasturing of hogs.

The first knowledge that complainant's witnesses had of any claim on behalf of Mississippi or its citizens was shortly before this action was brought. It appears that in or about 1923 Mississippi sold some of the land in question for delinquent taxes. On the assessment rolls of Issaquena County, Mississippi, the purchasers at these tax sales first appeared as owners in 1925–1926. The respond-

ent put in evidence assessment rolls for certain years between 1848 and 1926. They show that after 1883 certain of the lands within the original boundary of Tullos Island are marked "in river," or "in Mississippi River," and from time to time these lands so designated were assessed for taxation, sometimes for nominal amounts and sometimes for substantial sums. At times "Island No. 98" appears as a separate item on the rolls, although the surveys show that at those times the island had disappeared. It is described as of greatly varying sizes in different years. The evidence to be drawn from this source is quite contradictory and fails to show any dominion by Mississippi over the disputed territory.

The record sustains the master's finding that there is no proof that Louisiana or its citizens knew of or acquiesced in any purported dominion of Mississippi over the disputed territory. The respondent has failed to meet the test laid down in *Michigan* v. *Wisconsin*, 270 U. S. 295, with respect to exercise of sovereignty and dominion over the disputed territory, and acquiescence by complainant in such alleged possession. The master's fifth finding is sustained.

A decree should be entered as recommended by the master, appointing a commission to locate the thread of the main channel of the Mississippi River as the same was immediately prior to the avulsion of 1912–13; and the line when so located is decreed to be the boundary between the states, between latitude 32° 39′ on the north and the division line between Issaquena and Warren Counties, Mississippi (as extended westward), on the south. The parties are accorded forty days within which to submit a decree in accordance with this opinion.

*It is so ordered.*