**HUMBLE OIL & REFINING CO. et al.
v. SUN OIL COMPANY et al.**

No. 13312.

United States Court of Appeals,
Fifth Circuit.

June 20, 1951.

Carlton R. Winn, Dallas, Tex. Jesse P. Luton, Jr., Asst. Atty. Gen. of Texas, Price Daniel, Atty. Gen. of Texas, J. W. Timmins, and Martin A. Row, Dallas, Tex., for appellee.

Before HOLMES, McCORD and RUSSELL, Circuit Judges.

HOLMES, Circuit Judge.

On February 24, 1949, this action was instituted in the court below by Sun Oil Company, a New Jersey corporation, against Humble Oil & Refining Company, a Texas corporation, and two individual defendants, both citizens of Texas. Federal jurisdiction was based solely on diversity of citizenship. The suit was to establish title to and recover possession of the oil-and-gas leasehold estate in 26 tracts of land in Kenedy County, Texas; to remove clouds from said title; and to enjoin the defendants from interfering with Sun's use of said property. Sun's claim was that the land in suit was submerged by the waters of Laguna Madre, which was an arm of the sea belonging to the State of Texas; and that said land was leased by the state to Sun.

The defendants disclaimed title to three of the tracts, on the ground that these three were below mean high tide; as to the remaining tracts, the defendants claimed title under three ancient grants from sovereigns prior to and predecessors of the Republic of Texas. One of these grants, Big Barreta, was issued by the King of Spain; the others, Los Mirasoles and Little Barreta, were from the Mexican State of Tamaulipas; each of these grants called for its eastern boundary to be Laguna Madre. The defendants conceded that the land in controversy was a part of the bed of Laguna Madre when their grants were issued, but claimed that its elevation had been increased so that, when this suit was filed, it was above mean high tide, and was joined to and part of the upland. In Humble Oil and Refining Co. v. Sun Oil Co., 5 Cir., 175 F.2d 670, this court reversed an order restraining defendants from interfering with a ground survey of certain lands owned by the two individual defendants. This court held that injunctive relief did not lie, be-

Robert H. Kelley, Nelson Jones, Charles E. Shaver and R. E. Seagler, all of Houston, Tex. Jacob S. Floyd, Alice, Tex. Gordon Boone, Allen V. Davis, Corpus Christi, Tex., for appellant.

cause Rule 34, Fed. Rules Civ. Proc. 28 U.S.C.A., provided an adequate remedy. For the opinion below on the motion of the state to intervene, see 88 F.Supp. 658.

It was admitted by plaintiffs below that the land in controversy, at the time of suit, was above sea level and above mean high tide, and that the waters of Laguna Madre encroached upon this land only when blown there by the wind. If the common law were applicable, the call in each grant for Laguna Madre would make the line of mean high tide the eastern boundary of each grant; but, since the common law was adopted in Texas after the grants were issued, the boundary between the sea and the upland must be determined in accordance with the principles announced in Las Siete Partidas, the basic law of Spain and Mexico, which defines the shore of the sea as all the ground "which is covered with the water of the latter at high tide during the whole year, whether in winter or in summer." The appellants contend that land not covered by the ebb and flow of the tide is not seashore but a part of the upland even though occasionally covered by wind-driven sea water. The appellees contend that land is seashore if it is covered at any time during the year with sea water; and the appellees agree that, regardless of the present situation, at the time of the issuance of these Spanish and Mexican grants to Mirasoles, Little Barreta, and Big Barreta, the Laguna Madre was then a continuous body of water running from Corpus Christi Pass on the north to the Brazos-Santiago Pass on the south, and connected with the Gulf of Mexico at both ends. In their amended answer, the defendants below (appellants here) alleged that the land in controversy was formerly covered by the waters of Laguna Madre, but now lies above the line of not only mean high-tide but the highest tide in winter, and is accreted land, having accreted to and become a part of the aforesaid grants on which the Humble Oil Company holds valid mineral leases, which it acquired from the owners of said grants.

On the question of federal jurisdiction by reason of diversity of citizenship, we are governed by federal statutes and decisions; but, on the merits, our determination in varying circumstances may be ruled by the municipal laws of Spain, Mexico, the Republic of Texas, and the State of Texas. Even on the merits, so far as the eastern or seaward boundary of Padre Island is concerned, we are bound to limit the state's domain to low-water mark, under the decision of United States v. Texas, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221; but none of the land in controversy here is outside the inland waters. It is all claimed by appellants as accretions to the mainland, and by appellees as originally submerged land that has never been abandoned by the sea. Our interpretation of the several grants under which appellants claim, as well as the rights that passed under them, is governed by the municipal law of the particular state or sovereign that existed at the time of their issuance; but no riparian owner has a vested right in the general law of accretion, except as to the alluvion that was added to the shore while the law was in effect. In this case, we have not been apprised of any changes in the local law of accretion, though there have been may changes in sovereignty; for instance: Mexico gained its independence from Spain on September 27, 1821; the Republic of Texas was proclaimed by a convention on March 2, 1836; Texas won its independence on April 21, 1836; and it was admitted to the Union by a congressional joint resolution approved December 29, 1845, 9 Stat. 108.

Under the civil law, from the Institutes of Justinian until the present time, the seashore has been common property, and the alluvion that was added thereto belonged to the owners whose lands were bounded by the sea. This precept of the Roman law remains today as the guiding principle in both civil and common-law jurisdictions unless changed by code or statute. Thus the seashore is no part of the land but always an adjunct of the sea. The term shore, precisely defined, is not appropriate to land on the side of water that is not affected by the ebb and flow of the tide. The low-tide line is

the seaward boundary of the shore in both civil and common-law countries. Texas owns the seashore, except where valid grants have been made before or after its admission to the Union; and, under the common-law rule, the shore today is that strip of land between mean low-tide and mean high-tide, which is ascertained at any place from the average height of the water at that place over a considerable period of time. Borax Consolidated v. City of Los Angeles, 296 U.S. 10, 26–27, 56 S.Ct. 23, 80 L.Ed. 9. By the civil law, the shore extends to the line of the highest tide in winter. Mayor etc. of City of Galveston v. Menard, 23 Tex. 349; Galveston City Surf Bathing Co. v. Heidenheimer, 63 Tex. 559; DeMerit v. Robison, 102 Tex. 358, 116 S.W. 796; Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 729. In Borax Consolidated v. City of Los Angeles, 296 U.S. 10, at page 22, 56 S.Ct. 23, 29, 80 L.Ed. 9, the court said: "By the civil law, the shore extends as far as the highest waves reach in winter. [citing] Inst. lib. 2, tit. 1, § 3; Dig. lib. 50, tit. 16, § 112"; but we are governed on this point by state rather than federal decisions. Moreover, the original of the Institutes is: *Est autem littus maris, quatenus hibernus, fluctus maximus excurrit,* which may be literally translated: "However, the shore of the sea in the fourth quarter or winter is where the highest wave extends." According to the Digest, the Latin is: *Littus publicum est eatenus qua maxime fluctus exaestuat,* which literally translated is: "The public shore extends up to where the highest wave boils up or foams." The reference is not to waves or sea water in a storm but in an estuary, or exit to the sea, as when the water boils up where the tide meets the current of a river. The word *exaestuat* is from *exaestuo, are, avi, atum* (from which the English word aestuary is derived); it illustrates the danger from different versions in translations. Compare the law of Scotland, whereby the mouth of a river, *ostium fluminis,* comprehends the whole space between the lowest ebb and the highest flood mark (meaning the lowest ebb and highest flood of the tide). The ordinance of Louis XIV provides:

"All the space which is covered and discovered by the new and full moon, and as far as the tide extends at the high *flood* of March [emphasis supplied], shall be reputed to be the seashore."

There would be no certainty as to the upland boundary of the shore if we took into consideration points to which sea water is driven by the wind. There are vestiges of hurricane floods for fifty miles or more inland from Beaumont to Brownsville; and the shore of Texas would be cut into fantastic shapes by these overflows if wind-driven waters extended its upland boundary in low places, while the high ground on each side showed no evidence of such overflows. The tide is another matter; there is nothing erratic about it. The tide is the rising and falling of the water of the sea that is produced by the attraction of the sun and moon, uninfluenced by special winds, seasons, or other circumstances. Hale, DeJure Maris, Chapter 6; Scott v. Doughty, 124 Va. 358, 97 S.E. 802; Embry's Waters of the State, p. 256. The tide delimits the shore, and it is no respecter of the conflict of laws. Meteorological influences may be inextricably involved with the rise and fall of the true astronomical tide, but we should distinguish them as meteorological tides. Other influences may be described as atmospheric meteorological tides, but such tides are undoubtedly very minute, in comparison with the true astronomical tide, over a period of 18.6 years. Tide, Encyclopedia Britannica. Shore is sometimes said to be synonymous with "flats"; 19 Cyc. 1078; 29 Cyc. 355; but flats are not shore unless the tide ebbs and flows over them, and they are not alluvion belonging to the proprietor of the mainland unless they have been added to the shore by accretion.

No claim by reliction from Padre Island is made by appellants; and, since there can be no accession to land below tidewater (State v. Balli, 144 Tex. 251, 252, 190 S.W.2d 100, 101), sediment deposited upon submerged land off the shore and in the bed of the sea or an arm of the sea is not alluvion added to the shore of the mainland; and it is not accretion to

the mainland. Alluvion is a term applied to the thing deposited, while accretion denotes the process of increasing real estate by gradual and imperceptible deposition, through the operation of natural causes, to that already in the possession of the owner. The word accretion is derived from the Latin term *accrescere,* meaning to grow to; to be united with; to increase. It. is sometimes used in speaking of islands which are formed in rivers by deposit; Bouvier's Law Dictionary (8th Ed., 3rd Rev.); Calvinus Lexicon Juridicum; 3 Kent. 428; 3 Washb. R. P., 5 Ed. 50; but if an island arises in navigable inland waters, or emerges from an arm of the sea, it belongs to the owner of the bed of the water; so that, if the state owns the land under the water, it belongs to the state, while if the riparian owner has title to the bed, the island belongs to him up to the line of his ownership of the bed. If alluvion forms adjoining the seashore, the latter recedes with the tide; and, by the doctrine of accretion, any new alluvion that forms above the tide-line becomes a part of the contiguous upland estate. State v. Balli, supra. If an island arises, which belongs to the state, the latter is entitled to the land added thereto by accretion to the same extent as the owner of the mainland. 29 Cyc. 354, 355.

■ A lagoon is a shallow sound, channel, or lake, especially one into which the sea flows; such, admittedly, was Laguna Madre at the times of the original Spanish and Mexican grants from which the appellants trace their title. At each end of this lagoon was a bay, which was an inlet of the sea, smaller than a gulf, but of the same general character. A gulf is a portion of an ocean or sea extending into the land; a partially land-locked sea; as, the Gulf of Mexico, which is the eastern boundary of Padre Island, the shores of which are owned by the State of Texas. At this time, the water is navigable throughout the year from Corpus Christi to Brownsville, through the old channel of Laguna Madre, due to the construction by the United States of an intra-coastal canal, begun in 1947 and completed in 1949.

According to the findings below, Padre Island is approximately 110 miles long; it is situated off the coast of Texas, and contains approximately 135,000 acres of land; it runs almost the entire length of the coast between Corpus Christi and Brownsville. It is bounded by the Gulf of Mexico on the east, Laguna Madre on the west, Corpus Christi Pass on the north, and the Brazos-Santiago Pass on the south. In practically all of the maps prepared by the United States Geodetic Survey, maps on file in the Texas Land Office, and many others in evidence, Padre Island is shown as a long strip of land, colored in the same color as the mainland; in between, colored in blue, indicating water and connected with the sea at both ends, is an area called Laguna Madre, in which the land in controversy, as well as the land upon which Humble obtained leases from the State of Texas, is located. Various smaller islands between Padre and the mainland are shown on practically all of these maps, which also show that Padre Island is completely separated from the mainland along the entire coast, with outlets to the Gulf of Mexico. In one map of the Geodetic Survey, published in 1913, the immediate area involved here is shown for the first time as "Mud Flats," but with a larger over-all lettering of "Laguna Madre."

From maps, photographs, aerial mosaics, and the oral testimony of witnesses, the court below found that what commonly has been regarded as Laguna Madre, prior to this controversy, is clearly defined and easily visible. Around the grass line on the island and the mainland, there is a short sandy beach, which constitutes the shore of Laguna Madre, Spanish for mother lake or lagoon. The area in controversy is above sea level, sloping according to the contour from one one-hundredth of a foot above sea-level to three or four feet. Some of the islands in Laguna Madre at their high points are as much as 25 feet or more above sea level. It is impossible to determine what has accreted to the islands and what to the mainland. Deer and rattlesnakes have been seen on some of the islands in the lagoon; on some of them

are grass, cactus, sunflowers, and heavy brush, including large mesquite trees, especially on Toro Island.

Waters of the Laguna Madre stand throughout the year from Corpus Christi Bay on the north to a point approximately even with the south end of Lopena Island; and from the Brazos-Santiago Pass near Brownsville, on the south, to and including Redfish Bay, at a point less than a mile from Block 369, one of the tracts in controversy. It is from these bays and passes that sea water rolls over the lands in suit, throughout the year, driven by the prevailing winds, which continue from 9 to 10 months of the year. Within 24 hours after these strong winds start blowing, the waters of the sea roll in rapidly, inundating great portions of the entire area, including the inlets between the various islands and the shore of the mainland. The sea water rolls over the small sandy beaches to the grass lines, leaving foam, driftwood, and the like. The water is extremely salty; it covers all of the land in controversy for appreciable portions of the year. At such times this water contains literally millions of seafish; seagulls and pelicans are seen feeding on the fish. The water varies from three to four inches to many feet in depth; seaplanes can and do land upon it, and boats navigate it safely. Often the waters of the south and north basins are joined, and the various islands are isolated by water. When the water recedes, salt is deposited, fish die, and all of the area, except that on the beaches, is mud, sand, and leathery algae. During the dry season a large part of the area is dry. There is no grass or plant life of any kind in the entire area, except upon the islands. Some testimony dealt with the effect of storms and rainfall, but the court below thought that this had no substantial effect upon the movement of sea water over the lands in controversy. The finding is that sea water rolls over the entire area throughout the year, irrespective of storms or rainfall; that the movement of this sea water over the entire area is formidable, the pictures resembling general coastal water with considerable waves; and that there is a regular movement of sea water repeated many times throughout the year over all or part of the lands in controversy, but that this movement is caused by the prevailing winds and not by the ebb and flow of the tide.

This is not a suit at common law wherein the parties are entitled to a trial by jury as a matter of right, but it is an equitable proceeding in which the verdict of a jury would be merely advisory. Therefore, the court below committed no error in discharging the jury and hearing the case as a suit in equity; but appellants objected to the intervention, and we think error was committed in allowing the State of Texas to intervene as a party litigant. The trial court could not and did not acquire jurisdiction over the controversy between the State of Texas and the defendants. Aiken v. Cornell, 5 Cir., 90 F.2d 567, 568; Kendrick v. Kendrick, 5 Cir., 16 F.2d 744, certiorari denied, 273 U.S. 758, 47 S.Ct. 472, 71 L.Ed. 877. This is not a class action, and the court below did not have ancillary jurisdiction of the state's claim by reason of legal custody of the res to which the state asserts title. Rule 24(b) (2) does not confer upon a federal court jurisdiction to adjudicate a state's claim or require the court to permit a state to intervene in a case like this, where jurisdiction depends solely upon diversity of citizenship, and the presence of the state as a party litigant would defeat the jurisdiction of the court. The holding below mistakes the purpose and effect of the rule, which deals with the nature of the interest required of an intervenor where the federal court has jurisdiction of the claim. To allow the State of Texas to intervene here would introduce a new litigant, which is not an indispensable party and whose presence would destroy the jurisdiction of the court, a requisite of which is that all the parties on one side must be citizens of different states from all the parties on the other side: and the State of Texas is not a citizen of any state. See Postal Telegraph Cable Co. v. Alabama, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231; Edwards v. Glasscock, 5 Cir., 91 F.2d 625; Rose's Federal Jurisdiction and Procedure (4th Ed.), p. 250; Vol. 4, Moore's Fed. Practice, pp. 138–146; Rule

82 of the Federal Rules of Civil Procedure. The action of the trial court in allowing the intervention is reversed and the petition to intervene denied by this court under Sec. 2106 of the Judicial Code, 28 U.S. C. § 2106.

■ The obligation of the federal courts to follow the local law in land litigation existed before Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and while Swift v. Tyson, 16 Pet. 1, 41 U.S. 1, 10 L.Ed. 865, was in full force and effect; it is as old as the Judiciary Act of 1789. This rule of decision in land cases is so strong that, where a principle of law establishing a rule of property has been settled in the state court, the same rule will be applied by a federal court rather than the rule announced in a prior federal decision. Edward Hines Yellow Pine Trustees v. Martin, 5 Cir., 296 F. 442, citing and quoting from Jackson ex dem St. John v. Chew, 12 Wheat. 153, 161, 6 L.Ed. 583. The Edward Hines case, supra, was affirmed by the Supreme Court in 268 U.S. 458, at page 462, 45 S.Ct. 543, 69 L.Ed. 1050, wherein the court said, that both the meaning of state statutes and the rules of the unwritten law of a state, affecting property within the state, are peculiarly questions of local law to be ascertained and established by the state courts. 268 U.S. at page 464, 45 S.Ct. at page 546, the court further stated:

"To avoid the uncertainty and injustice which result from 'the discordant elements of a substantial right which is protected in one set of courts and denied in the other, with no superior to decide which is right' (Brine v. Insurance Company, 96 U.S. 627, 24 L.Ed. 858), this court has not hesitated, when there has been a conflict of decision between it and the state courts affecting a rule of property within the state, to overrule its own decisions and to follow the state decisions once it has become evident that they have established a 'rule of property' as the settled law of the state. Green v. Lessee of Neal, 6 Pet. 291, 8 L.Ed. 402; Suydam v. Williamson, supra [24 How. 427, 16 L.Ed. 742]; Fairfield v. County of Gallatin, 100 U.S. 47, 25 L.Ed. 544; Roberts v. Lewis, 153 U.S. 367, 376, 14 S.Ct. 945, 38 L.Ed. 747, and see Bauserman v. Blunt, supra [147 U.S. 647, 13 S.Ct. 466, 37 L.Ed. 316], overruling a decision of the Circuit Court ante-dating a conflicting decision of the state court. We are therefore constrained in the present case to accept the view of the state courts as announced by them without inquiring, as an original proposition, into the justice and sufficiency of the rule which we follow."

See, also, Thompson v. Magnolia Petroleum Company, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876.

■ The appellees contend that the acceptance of leases by the Humble Oil Company from the State of Texas on other lands shown on the official map of Laguna Madre, on file in the general land office of Texas, estops appellants from denying that the land in controversy in this suit is now a part of Laguna Madre. In September, 1947, the Texas School Land Board gave notice of its intention to lease for minerals the land in controversy, and also other lands, to the highest bidder. In October, 1947, the Board was notified on behalf of appellants that the lands in controversy were above mean high tide and were private property owned by appellants. The latter also requested that the areas in question be withdrawn from sale or, at least, that prospective bidders be advised of the writer's claim of ownership. Humble advised the Board that it owned leases covering the land which the latter proposed to lease; and it joined in the protest made by its lessors. Having protested the leasing of the area without avail, Humble, in an effort to buy its peace, bid on each tract offered for leasing. As to the land in controversy, Sun was the highest bidder and was awarded the lease. As to other tracts, Humble was the highest bidder and was awarded the leases, each of which contained the following language: "Tract ——, Laguna Madre, containing —— acres in Kenedy County, as shown by the official map of Laguna Madre now on file in the General Land Office"; which the trial court held estopped Humble to deny that the lands in controversy were a part of Laguna Madre. We find no sound basis for estoppel in this language. It is not recited

that the land is submerged, or that it is owned by the state, or that it does not belong to appellants. The language is merely a general description of the location of the particularly numbered tract. So far as the appellants are concerned here, the transaction amounted to no more than if, in order to remove a cloud from their title, they had taken a quitclaim deed to the minerals in land in Laguna Madre not involved in this suit.

The appellants do not assert a grant from any sovereign to this controverted area; but they claim it by accretion to the shore of the mainland. The crucial question for determination is whether land, which admittedly was a part of the original bed of Laguna Madre and outside of appellants' mainland grants, has become a part of the mainland under the doctrine of accretion. The burden of proving this was on appellants; and we think, upon the undisputed facts, that they failed to meet this burden. If we are incorrect about this as a conclusion of law, and contrary reasonable inferences may fairly be drawn from the undisputed evidence, then the lower court's finding as to the alleged accretions is against appellants; and we cannot say that it is clearly erroneous, the finding being that there has not been any substantial change or building up of the area since the original surveys. Before the jury was discharged, the court suggested that there was possibly a jury issue on this point; but no request was made for its submission. The court assigned the following, among other reasons, for its decision:

"One of the things that impels me to this conclusion is a report, accompanied by a sketch made by Lieutenant Meade (later General Meade) in February, 1846, while serving under Zachary Taylor, preliminary to the invasion of Mexico. (Plaintiff's Exhibit No. 88.) It is an historical fact that General Taylor's army landed at Flour Bluff, near Corpus Christi, north of the area involved. Lieutenant Meade explored the possibility of transporting various army equipment across Laguna Madre to Padre Island and continuing down the island to near Brownsville. Circumstantially, he seems to have arrived at a point opposite or near the southeast end of Lopena Island and reported the finding of flats and water at about the same depth as it is on the ground today. He stated that information was received that 'this flat extended some 14 miles down, with only 14 inches of water, and beyond there was a good channel for 14 miles to the Colorado and from thence down to the Brazos Santiago.' This 14 miles from the same approximate point east of Lopena would go over to the very flats area as it is today, and, roughly, to Redfish Bay on the South. Since this was in February of 1846, at a time of the year when the evidence shows that the waters of the sea now roll in, over, and upon the area involved, the depths of the water and the observations of Lieutenant Meade are significant to my mind. The line of demarcation between the Laguna and the mainland is still patent for all to see. The area in controversy, as well as the entire bed of the lagoon, is not fast land. Nothing grows or can be grown upon it."

The trial judge found no convincing evidence of any substantial accretions to appellants' mainland grants; but found that, even if the bed of Laguna Madre had been gradually built up until it was above mean high tide, a substantial portion of such accretions, if not all, was to Toro Island, title to which had never been relinquished by the state. Finally the court said that it was practically impossible to apportion accretions, if any, as between Toro and portions of appellants' grants.

We find no reversible error in the record except as pointed out with reference to allowing a state to intervene. As to the State of Texas, the judgment appealed from is reversed, and rendered in accordance with this opinion; otherwise the judgment is modified so as not to be binding upon the State; and as so modified it is affirmed.

Modified and affirmed.