**ANDERSON–TULLY COMPANY,**
Plaintiff,

v.

**Dr. J. M. WALLS et al., Defendants.**

**No. GC659.**

United States District Court
N. D. Mississippi,
Greenville Division.

March 31, 1967.

M. E. Ward, Dent, Ward, Martin & Terry, Vicksburg, Miss., for plaintiff.

William H. Drew, Lake Village, Ark., Philip Mansour, Greenville, Miss., for defendants.

## OPINION

CLAYTON, District Judge.

The plaintiff, Anderson-Tully Company, a Michigan corporation, filed its complaint alleging that it is the owner of the land in litigation generally known as Luna Bar, which was a part of a larger tract of land known as Carter Point,[1] which the plaintiff acquired from the C. W. Hunter Company. A deraignment of plaintiff's title, which shows an unbroken paper chain of title to the riparian Sections 1, 2, 3 and 4 of Township 18 North, Range 9 West, and Section 19, Township 18 North, Range 10 West was attached to the complaint as an exhibit. The defendants admitted the correctness of the deraignment of title, but did not admit that a part of Luna Bar was included in the deraignment. They claimed rather that Luna Bar was not located in the State of Mississippi.

The complaint further alleged that defendants were making some sort of claim of title to this land and that three of them had filed a suit in the Chancery Court of Chicot County, Arkansas, and had obtained an injunction against one J. C. Smith, enjoining him from going on a portion of the lands which are in controversy here.

Basically, the complaint is cast as a quiet title action and asks that the court decree the plaintiff to be the owner of the property in question, Luna Bar, as well as the remainder of Carter Point and that the claim of defendants be quieted and removed and that defendants be enjoined from proceeding further with the aforementioned Arkansas suit and from filing, in the State of Arkansas, other suits against the plaintiff, its agents, servants or lessees based upon any claim of title to said land and from interfering in any way with the use, possession and enjoyment of said lands by plaintiff.

Defendants' answer denied that Luna Bar was located in the State of Mississippi and denied plaintiff's title thereto.

1. Carter Point is in Mississippi. This is in no way questioned by defendants.

By counterclaim defendants allege that they are the owners of Section 5, Township 15 South, Range 1 West in Chicot County, Arkansas, and claimed additional lands which they unsuccessfully attempted to describe.

Defendants claim that Dr. Walls and his wife are the owners of the plantation known as "Panther Forest Plantation" and they allege title to be vested in third parties to the North half of Section 9 and the South half of Section 9, but none of these alleged owners were ever made parties to this suit.

Defendants ask that the complaint be dismissed, that their title be confirmed, that a restraining order of this court[2] be dissolved and that plaintiff be enjoined from interfering with defendants' use and enjoyment of the land in question.

It may be well to note that there is no description of any kind in any of the pleadings of defendants which would fit at all the land generally referred to as Luna Bar.

Plaintiff answered the counterclaim,[3] admitting that there appeared of record in Arkansas a deed from Roy H. Sheffield, Sr. and his wife to Dr. and Mrs. Walls. The description of the land so conveyed was inserted in the answer and this apparently is the same land to which the defendants Walls claim title as shown by the deraignment of title filed by them in this cause. Plaintiff's answer also averred that the description of any lands contained in defendants' pleadings did not describe any lands located on Luna Bar and denied that the defendants' pleadings or deraignment of title described or applied to any lands lying south and east of the abandoned Spanish Moss Bend. This answer also denied title of the defendants to any part of the lands here in litigation.

The case was tried to the court without a jury and has been submitted on briefs. Resolution of the issues tendered by the pleadings and developed by the evidence requires this court to establish the genesis of Luna Bar, to determine how Luna Bar was formed and to decide the location of the thalweg of the Mississippi River at the time of and after an evulsion afterward to be mentioned which resulted from the opening of a new channel which is known as Tarpley Cutoff.

## I.

Source materials relevant to the history of this reach of the river consisting of documents, surveys, plats, maps, aerial photographs, controlled mosaics and the like were introduced and have been carefully considered by the court. Apparently, they are exhaustive. These and the testimony of an eminently qualified engineer who has spent most of his professional life working with the river and who was a witness for plaintiff make it clear that from at least 1821 until about 1872 there was no bar formation of any kind opposite Carter Point, which is a horseshoe-type land formation or point lying in a generally northeast-southwest position which originally had a narrow neck as its northeast part and which was originally surrounded (except for the narrow neck) by a horseshoe bend in the Mississippi River. The first indication of any such bar formation is shown by the maps of the Chicot County levees prepared by E. A. Douglas, engineer in charge, in 1872. These show that the river had by then eaten away a considerable portion of the Arkansas mainland and had broached the then existing levees on the Arkansas side. They also show a long, narrow, dry bar forming in the river adjacent to Carter Point, Mississippi, in the upper part of Spanish Moss Bend.

Suter's 1874 Reconnaissance Survey shows that steamboat navigation then followed closely along the right (Arkan-

---

2. Before trial this court entered a show cause order as to why a temporary injunction should not issue, but any need for one was obviated by agreement, the effect of which was to stay proceedings in the Arkansas suit pending disposition here. No restraining order was issued.

3. Called by defendants a "cross-complaint".

sas) side of the river throughout Spanish Moss Bend.[4] This map, according to plaintiff's said witness, provides the first official river survey record of a long, narrow, dry bar being formed by the river on the Mississippi side of the channel thalweg and navigation course. This map shows that the sand bar was dry at the time of the 1874 survey and was low, recently formed, and was not then supporting any type of vegetation.

The first controlled survey of the Mississippi River in this vicinity is shown by Chart 39 of the 1882, October 23–25 Mississippi River Commission Hydrographic-Topographic Survey of the Mississippi River. The soundings and locations of navigation lights as shown on this map show that the channel thalweg and navigation course continued deep in Spanish Moss Bend, close along the right (Arkansas) descending bank and to the west of the bar. Luna Bar at that time had a crest elevation of 120 feet, whereas the adjacent overbank elevations range from 135 to 140 feet. Luna Bar at this stage of its development was a low, dry sandbar, void of vegetation.

At the time of the 1882 survey, the deepest water between this developing bar and Carter Point was about six feet, and, apparently, in 1881, 1883, 1886, 1887, 1888, 1889 and 1891 there would have been a dry connection between Luna Bar and Carter Point over which one could have walked across on dry land. At the same time, the thalweg was holding to the right (Arkansas) bank of Spanish Moss Bend and navigation was close against the Arkansas side.

An 1892 Caving Bank Survey of Spanish Moss Bend showed that navigation lights were along the right bank. The 1894 Hydrographic Survey of the Mississippi River shows the same lights and the thalweg and navigation course was deep in Spanish Moss Bend. And, a comparison of the 1882 and 1894 maps shows that approximately 700 feet of the Arkansas bank had caved away in the deep-

est part or bight of this bend, and the elevation of Luna Bar had increased some 10 to 12 feet.

Charts 38 and 39 of the 1913 Hydrographic Survey show that the navigation lights remained along the right bank and that the thalweg continued deep in Spanish Moss Bend and west of Luna Bar. At that time Luna Bar was still a dry sandbar, devoid of vegetation.

The 1925 Hydrographic Survey shows that the lighted navigation course and channel thalweg remained close to the right bank and west of Luna Bar in Spanish Moss Bend. The controlling crossing depth from Carter Point to the Arkansas shore in Spanish Moss Bend was 20 feet, while the deepest channel between Luna Bar and Carter Point was 13–14 feet, along a narrow, crooked path. This survey also shows the first recorded existence of any vegetation. This is shown by the legend "small willow" and "willow" on the lower east side of Luna Bar.

The 1933 Hydrographic Survey shows the lighted navigation course and channel thalweg remained deep in Spanish Moss Bend and west of Luna Bar. It is significant that between 1925 and 1933 about 1,000 feet on the east side of Luna Bar had eroded away, including the crest area at the foot of the bar which was shown on the 1925 survey and had formerly been a host to some willow growth. The willow growth shown in 1933 was located west of the area of willow growth as shown in 1925. In 1925 the main channel against the Arkansas bank was some 37 feet deeper than the opening between Luna Bar and Carter Point. In 1935 the main channel against the Arkansas bank was 33 feet deeper than the channel between Luna Bar and Carter Point.

In sum, the overwhelming weight of the engineering evidence shows that at all times before the avulsion of 1935, afterward to be mentioned, the navigation channel and the thalweg were against the

---

4. All of the evidence shows clearly that the thalweg and course of navigation had followed this same route at all times before this date.

right (Arkansas) bank in Spanish Moss Bend and that the sometimes channel between Luna Bar and Carter Point could be used for navigation only during periods when the water was high.

On the 21st day of April, 1935, Tarpley Neck Cutoff, which was constructed across the aforementioned narrow neck which joined Carter Point to the mainland, was opened to the flow of the Mississippi River and thereafter the river rapidly enlarged and adopted this new channel and soon abandoned the older channel which was by way of Spanish Moss Bend. Navigation quickly abandoned Spanish Moss Bend for the shorter Tarpley Cutoff channel.

It is uncontradicted that the construction and opening of this cutoff and the ensuing events aforementioned became what is known as an avulsion. This is demonstrated by the 1936 Hydrographic Survey of the Linwood Neck-Spanish Moss Bend reach of the river which showed that by that time the old navigation channel had filled, the navigation lights had been removed, and had been installed in Tarpley Neck Cutoff, and navigation was then using Tarpley Neck Cutoff channel at all stages of the river. The water tables had been lowered some five feet by this cutoff and others which had been constructed by the engineers and the old bed of the river in Spanish Moss Bend had commenced to shoal at a rapid rate. The former live thalweg in Spanish Moss Bend had now become a dead thalweg and, insofar as this litigation is concerned, this dead thalweg became the boundary between the States of Mississippi and Arkansas [4a] and had become permanently fixed by the doctrine of avulsion.

The greatest recorded confined flood in the history of the river came in 1937. It was the largest flood in which the levee system held, confining the waters of the Mississippi River between the levees on each side. The tremendous volume of water which coursed between the

two levees completely covered all of the land in controversy here and a reverse flow of the river developed with a portion of the waters coursing southward through the upper portion of Rowdy Bend (up river) and down the old chute of island 82 (to the north and slightly west of Carter Point) rushing past Luna Bar. The eastern side of the bar took the full brunt of this torrent and the resulting erosion left the channel between Luna Bar and Carter Point substantially wider than the old abandoned channel around Spanish Moss Bend, but, the bed of the channel between the bar and Carter Point was raised by the vast amounts of sand and silt carried by these flood waters and deposited there. The increased elevation in this channel was approximately eight feet, while the elevation in the dead thalweg increased only five feet. This widening of the channel between Luna Bar and Carter Point accounts, in the only plausible way, for the theory advanced by defendants that at one time the sailing channel (and thalweg) was located east of Luna Bar rather than to the west around Spanish Moss Bend. The testimony in support of this theory is imaginative and incredible.

The 1937 flood also reactivated the old chute on Island 82 (to the north and west of Carter Point) and this created a danger that the river would adopt a new channel through a bend in the river above Carter Point, across the old chute of Island 82, and into Spanish Moss Bend. To alleviate this danger, the United States Engineers in 1939 constructed a sand fill across a part of an old channel up river from the area with which we are primarily concerned and this channel was built to approximate levee height. The effect of this fill was to close off the aforementioned reverse flow and it caused extensive natural filling in the unused portions of the older channel. A 1963 controlled mosaic shows that the upper part of the old Spanish Moss Bend to be completely filled by that time and

4a. For the two enabling acts by which the States of Arkansas and Mississippi were admitted to the union, see State of Ar-

kansas v. State of Mississippi, 250 U.S. 39, 41, 39 S.Ct. 422, 63 L.Ed. 832.

consolidated with riparian lands in Mississippi and Arkansas. The old Spanish Moss channel and the channel between Luna Bar and Carter Point by then were filled and supporting willow growth, except for narrow, shallow channels, both of which would run dry at low river stages.

From what has been said, it seems obvious from the engineering standpoint that Luna Bar was created within the territorial limits of the State of Mississippi [5] and that it was formed and built up as alluvial deposit made by the river as accretions to Carter Point, which is conceded to be within the State of Mississippi.

It is apparent that from 1894 through 1963 there was a progressive westward erosion of the Arkansas bank within the area with which we are now concerned with a corresponding building up of accretions to the Mississippi shore as defined by Carter Point. During this entire period the Arkansas bank was steep and caving, while the Mississippi shore was sloping and building. Although there were always two channels present, the deepest or main channel was always to the west against the Arkansas shore, while the easternmost channel between Luna Bar and Carter Point remained shallow and unusable for navigation except in periods of high water. This is demonstrated by the fact that this easternmost channel went completely dry almost every year from 1881 through 1891.

## II.

Paralleling the aforementioned findings which are the product primarily of the aforementioned source materials, the uncontradicted evidence in the record from competent foresters is that as alluvial lands are built up by the actions of the Mississippi River, there is a period of time during which such deposits will not support vegetation. Only after the deposits have reached an elevation high enough to remain out of the water for substantial periods of time will vegeta-

tion be supported. As earthen particles are deposited on the original sandy bed, willow and cottonwood first will commence to grow. If the tops of these trees are covered by water during the growing season, they will die for lack of oxygen, but if the tops of the trees remain above water during the growing season, they will then reproduce and become a permanent forest. The normal biological succession of forest species consists of three classes. The first or pioneer species is that of willow and cottonwood with the willow growing on the lower, wetter lands, and cottonwood growing on the higher, drier ridges. It usually takes about 50 to 70 years for the pioneer forest to mature, after which the secondary species, which consists of hardwoods such as pecan, ash, hackberry and sycamore, take hold. As the secondary forest begins to fully mature and to die out, then the tertiary or climax species begin to develop, such as oak. However, there is, of course, some overlapping between the primary and secondary species and between the secondary species and the tertiary or climax species. This biological succession is demonstrated in this record by a series of photographs of known forest developments in the Mississippi River valley, with the pictures being made at appropriate time intervals.

A disinterested expert forester as a witness for plaintiff testified with respect to a study made by him on the land in question along a surveyed reference line which typifies the forest growth in the area with which the court is here concerned. He made a number of increment borings to determine the actual age of representative trees along this surveyed line. It was his opinion that Luna Bar was alluvial lands and that the soil had not reached a condition which would support vegetation until the period of about 1925–1930. This confirms the opinions expressed by plaintiff's aforementioned engineer and the information shown on the Hydrographic Surveys of 1925 and 1933 that some earlier willow

5. This, of course, is limited in its application to a determination of the rights of the private parties and the plaintiff corporation to the lands in question here.

growth on the eastern side of the bar was destroyed by erosion and that a second start of timber growth commenced sometime between 1925 and 1933.

The aforementioned surveyed line was established by a forester employed by plaintiff who is also a licensed land surveyor and was properly referenced to the physical evidence of other surveys relevant here. This employee of plaintiff was in complete agreement with the opinions expressed by the independent forester.

Defendants made an earnest effort to refute the forestry evidence offered by plaintiff. Within the area involved here their witnesses had located and taken pictures of eight trees (a sycamore, ash, pecan, mulberry, hackberry (2), box elder and sweet gum), which were claimed to be of such sizes and ages as to be incompatible with the theory of plaintiff as to the age of the bar and the development of the forest growth thereon, since it takes about 50 to 70 years for the pioneer forest to mature before the secondary species takes hold. The existence of hardwood trees on the bar was established by other witnesses for the defendants. However, the ages of these trees which could be established from a ring count was consistent with plaintiff's theory and the location of the other trees in the disputed territory is not at all inconsistent with the progressive development of a forest on lands such as those in dispute here. It must be borne in mind, as aforementioned, that there always is some overlapping between pioneer and secondary species and between secondary and tertiary or climax species. It is not at all unusual, especially where openings occur in a pioneer forest through logging operations or otherwise, for seeds of the secondary and tertiary species to be washed in, take hold, and grow.

In sum, the weight of the evidence as to vegetation is that the bar is overwhelmingly composed of the pioneer species, but with scattered isolated trees of the secondary group, and an occasional young tree of the climax species.

### III.

In addition to the findings predicated on the engineering evidence, i. e. maps, charts, surveys, aerial photographs and controlled mosaics, the overwhelming weight of the evidence from a navigational standpoint is that before the opening of Tarpley Neck Cutoff in 1935, all descending navigation crossed over from Carter Point to the Arkansas bank in running Spanish Moss Bend and then followed along the Arkansas bank throughout the reach of Spanish Moss Bend. At no time until 1935 did the riverboats ever go east of Luna Bar, except in times of high water, during which the boats would take the short cut between Luna Bar and Carter Point. This evidence is entirely consistent with the conclusions expressed by plaintiff's engineer witness.

There was some evidence for defendants which might be said to tend to show that at some time regular river traffic used the channel between Luna Bar and Carter Point. However, this evidence was indefinite and illusory. Heretofore, it has been described as imaginative and incredible.

After the opening of Tarpley Neck Cutoff in 1935, all the evidence is that all navigation thereafter has used only the channel established by this cutoff.

### IV.

One of defendants' witnesses was a qualified engineer, but he voluntarily disqualified himself as any sort of expert to testify as to accretions, alluvion, navigation, cutoffs or other phenomenon common in the history of the Mississippi River. In fact, he expressed an amazingly narrow view with respect to the proper function of a surveyor and with respect to the responsibilities of a surveyor. He rightfully disclaimed any knowledge of surveying of accretion lands, and the plat which was introduced as an exhibit to his testimony was obviously prepared contrary to almost every rule for the surveying of riparian land. This plat shows that the south line of the survey was run due east until it reached the thalweg of the old abandoned

bend (Spanish Moss Bend) and continued on across the accreted lands without deviation to the original meander line of the river. This point was still west of the northeast corner of Section 4 and the survey continued northeasterly along the old meander until it reached a point south of the northeast corner of Section 4, at which point it turned and ran north. This was an apparent effort to reconstruct a section which had been partially eroded by the river and it ignored entirely any effect a change in the river would have on the boundary of a riparian section.

Defendants attempted to establish by the testimony of this witness that Luna Bar was actually in existence at the time the original General Land Office Surveys were made and that it remained in existence at all times from 1820 to the present time as a part of the territory of the State of Arkansas. However, it is necessary to note that the extent of his investigation into the problem was to examine an early stream channel map of an extremely small scale which was intended to show the location of the Mississippi River at certain dates in its history. From this examination, it was his view that the river had two channels in 1893 in this area and that it had so split before 1881. He also apparently theorized that a "little white dot" on this map was in fact Luna Bar and he further theorized that this never went under water. The General Land Office Surveys completely refute the existence of such an "island" at the times mentioned by this witness, and a proper reading of the map upon which he relied does not justify his conclusion that the "little white dot" never went under water. Rather, a proper reading of this map will demonstrate that this particular white spot had to have gone under water.

Moreover, it is interesting to note that this witness admitted on cross examination that the aforementioned original surveys are better evidence of the condition of the river than was the composite map upon which he relied.

In short, proper analysis of the testimony of this witness requires a finding that it is not helpful to defendants.

### V.

Additionally, the overwhelming weight of the evidence is that plaintiff and its predecessors in title have continuously exercised control over Luna Bar since at least 1931. At that time the bar was mostly sand with very small willows starting to grow. For a period of approximately 30 years, the timber overseer of a predecessor to plaintiff in title farmed approximately 80 acres of this land, planting it to crops each and every year. He also had a herd of cattle on Carter Point and these also grazed onto Luna Bar. A fence was constructed by him along the north side of Luna Bar connecting it with the mainland on Carter Point. This fence was maintained until plaintiff succeeded to title. During that period of time, Carter Point was logged for timber several times, but there were no timber operations conducted on Luna Bar since the timber thereon was not then merchantable. Moreover, during that same period of time, this timber overseer evicted hunters from Luna Bar and made citizens arrests of these poachers on a number of occasions.

### VI.

Certain principles of law with respect to boundaries between states which are based primarily upon navigable rivers have long since become settled by decisions of the United States Supreme Court. Those principles, applicable here, will be stated briefly following.

When a navigable river forms the boundary separating one state from another, in the absence of a special convention between the states, or long use equivalent thereto, the thalweg or middle of the main navigable channel is to be taken as the true boundary line. State of Iowa v. State of Illinois, 147 U.S. 1, 13 S.Ct. 239, 37 L.Ed. 55; State of Arkansas v. State of Tennessee (I), 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638; State of Louisiana v. State of Mississippi, 202

U.S. 1, 26 S.Ct. 408, 50 L.Ed. 913 and State of New Jersey v. State of Delaware, 291 U.S. 361, 54 S.Ct. 407, 78 L.Ed. 847.

The thalweg is defined as meaning the middle of the main navigable channel, the track taken by boats in their course down the stream, which is that of the strongest current. State of New Jersey v. State of Delaware, supra; State of Iowa v. State of Illinois, supra; State of Louisiana v. State of Mississippi, supra; State of Arkansas v. State of Mississippi, 250 U.S. 39, 39 S.Ct. 422, 63 L.Ed. 832; and State of Arkansas v. State of Tennessee (II), 269 U.S. 152, 46 S.Ct. 31, 70 L.Ed. 206.

■ Where the course of the boundary stream changes through the operation of the natural and gradual process of erosion and accretion, the boundary follows the stream and remains the varying center of the channel. Mayor, Alderman, etc., of New Orleans v. United States, 10 Peters 662, 9 L.Ed. 573; State of Nebraska v. State of Iowa, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186; State of Missouri v. State of Nebraska, 196 U.S. 23, 25 S.Ct. 155, 49 L.Ed. 372; and, State of Arkansas v. State of Tennessee (I), supra.

■ When, however, from any cause, natural or artificial, a boundary river suddenly leaves its old channel and seeks a new bed, this sudden and rapid change is termed an avulsion and the resulting change works no change of boundary, which remains in the middle of the old channel, although no water may be flowing in it, and irrespective of subsequent changes in the new channel. Mayor, Alderman, etc., of New Orleans v. United States, supra; Jefferis v. East Omaha Land Co., 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872; State of Nebraska v. State of Iowa, supra; State of Missouri v. State of Nebraska, supra; State of Arkansas v. State of Tennessee (I), supra; State of Louisiana v. State of Mississippi, 282 U.S. 458, 51 S.Ct. 197, 75 L.Ed. 459.

■ In case of an avulsion, so long as the old channel remains a running stream, the boundary marked by it is still subject to be changed by erosion and accretion; but when the water becomes stagnant, the effect of these processes is at an end; the boundary then becomes fixed in the middle of the channel and the gradual filling up of the bed that ensues is not to be treated as an accretion to the shores but as an ultimate effect of the avulsion. State of Arkansas v. State of Tennessee (I), supra.

■ Where an island is formed in a navigable stream which is the boundary between states, the island belongs to the state situated on the side of the thalweg on which the island is formed. State of Kansas v. State of Missouri, 322 U.S. 213, 64 S.Ct. 975, 88 L.Ed. 1234 and City of St. Louis v. Rutz, 138 U.S. 226, 11 S.Ct. 337, 34 L.Ed. 911.

■ The degree of proof to fix a boundary between states where a channel of river forming the boundary is abandoned is such certainty as is reasonable as a practical matter, having regard to the circumstances. State of Arkansas v. State of Tennessee (II), supra.

In State of Iowa v. State of Illinois, supra, the Supreme Court held that the boundary between states is fixed by the rule of thalweg—the middle of the main navigable channel. It quoted with approval from the case of Buttenuth v. St. Louis Bridge Co., 123 Ill. 535, 17 N.E. 439, as follows:

The law as stated by law writers, and in the adjudged cases, seems to be that where a river is declared to be the boundary between states, although it may change imperceptibly from natural causes, the river "as it runs continues to be the boundary." But if the river should suddenly change its course, or desert the original channel, the rule of law is, the boundary remains in the middle of the deserted river-bed. Where a river is a boundary between states, as is the Mississippi between Illinois and Missouri, it is the main, the permanent, river which

constitutes the boundary, and not that part which flows in seasons of high water, and is dry at other times. Handly's Lessee v. Anthony, 5 Wheat. 374 [5 L.Ed. 113]. In no other way would a river be a permanent fixed boundary, at all times readily ascertainable. There are many cogent reasons why the boundary lines between states should be permanent; otherwise, territory in one state at one time, sooner or later might be in another state. It must be in one state all the time, or else the state would lose jurisdiction over it.

The foregoing general principles have been stated somewhat similarly by the Supreme Court of Mississippi. In Sharp et al. v. Learned, 195 Miss. 201, 14 So.2d 218, among other things, it was said:

And in the matter of substantive law we have applied the four rules upon which the authorities are in general agreement, as follows:

(a) Territory transferred from one side of a boundary river to the other by a gradual process of erosion on one side and accretion on the other becomes a part of the state to which it is added.

(b) Territory transferred from one side of a boundary river to the other by avulsion continues to be a part of the state of which it was originally a part.

(c) Accretion or alluvion is an addition to riparian land made by the water to which the land is contiguous, so gradually and imperceptibly that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on.

(d) Avulsion is a change in a boundary stream so rapidly or so suddenly made, or in such a short time, that the change is distinctly perceptible or measurably visible at the time of its progress. Or to state it otherwise, so far as concerns practical purposes, when the change is not by accretion, it is by avulsion.

The owner of riparian lands in Mississippi holds title to the bed of the Mississippi River extended to the thalweg of the river, subject only to the superior rights of navigation. Hill City Compress Co. v. West Kentucky Coal Company, 155 Miss. 55, 122 So. 747. See also Anderson-Tully Company v. Tingle, 5 Cir., 166 F.2d 224.

In United States Gypsum Company v. Reynolds, 196 Miss. 644, 18 So.2d 448, where no map was available and no witness alive to show the action of the river between 1829 and 1858, except that there was proof that the riverbed had gradually moved to the south and east, the court, inter alia, stated:

The weight of authority, both state and federal, is that there is a presumption, founded upon long experience and observation, that a movement such as happened here between 1829 and 1858 was by gradual erosion and accretion.

The location and movement of Luna Bar was well documented from the time of Douglas Survey of 1872. As has been said, it was at all times, from its genesis, attached to Carter Point, which is in Mississippi, by a strip of land which went dry in periods of low water. But, even if, as it seems, defendants' claim is that the bar was an island and even if it was in fact an island, this would be irrelevant. Even if it was an island, it was formed on the Mississippi side of the thalweg and thus belonged to the owner of Carter Point. State of Kansas v. State of Missouri, supra and City of St. Louis v. Rutz, supra. Hill City Compress Co. v. West Kentucky Coal Company, supra. See also Humble Oil & Refining Company v. Sun Oil Company, 190 F.2d 191 (5th Cir. 1951).

The deraignment of plaintiff's title was admitted by defendants, but they state that this does not constitute an admission that Luna Bar was included within the deed. From what has been said, this position is untenable since it overlooks the fact that all accretions which have been added to these riparian

sections have become a part of the original tract and are covered by the legal descriptions "Sections 1, 2, 3, 4, and 19", whether accretions were expressly mentioned or not. Crill v. Hudson, 71 Ark. 390, 74 S.W. 299; Mobbs v. Burrow, 112 Ark. 134, 165 S.W. 269, and Smith v. Leavenworth, 101 Miss. 238, 57 So. 803. Although the legal description of the land conveyed to plaintiff by its deed includes the land here in controversy as has been shown, such a description is surplusage, being unnecessary to convey these lands which were formed by accretion.

### VII.

■ In sum, the overwhelming weight of the evidence is that Luna Bar originated as alluvion, located entirely within the State of Mississippi, since it was first formed on the Mississippi side of the thalweg as it existed at the time of its origin; that this bar has at all times remained in the State of Mississippi, and the division line between the lands of plaintiff and defendants (Walls) is the dead thalweg of the Mississippi River as it existed immediately following the Tarpley Neck Cutoff in 1935. This boundary is accurately fixed by the engineer witness for plaintiff and was described by reference to geodetic positions which is the type of description which was approved by the United States Supreme Court in State of Mississippi v. State of Louisiana, 350 U.S. 5, 100 L.Ed. 6, 76 S.Ct. 29. The land included in this description has been, in contemplation of law, in the possession and under the control of plaintiff and its predecessors in title for more than thirty years prior to 1962. This is especially true in view of the wild nature of the land. Evans v. Shows, 180 Miss. 518, 177 So. 786. In the case here, since the Mississippi River is the boundary, possession of Carter Point extends constructive possession out to the Mississippi River and includes Luna Bar.

■ Finally, plaintiff prayed that an injunction issue to prevent defendants from prosecuting suits in the courts of the State of Arkansas which would harass plaintiff and its lessees in their enjoyment of possession of this land. To permit such suits to be prosecuted in the courts of Arkansas would be to attempt to circumvent the laws of the proper state, where the lands so clearly lie in the State of Mississippi. Sharp v. Learned, 185 Miss. 872, 188 So. 302.

Plaintiff is entitled to all of the relief sought by the prayer of its complaint. Defendants are entitled to no relief and none will be granted to them.

A judgment will be entered cancelling the claims of the defendants Walls to the lands in questions here and quieting plaintiff's title to the lands described as aforementioned as against all claims of title thereto of the defendants Walls and to enjoin all of the defendants from further prosecution of any litigation in the courts of the State of Arkansas having to do with title to Luna Bar.