SHARP *et al. v.* LEARNED.

(Division B. June 7, 1943. Suggestion of Error Overruled July 9, 1943.)

[14 So. (2d) 218. No. 35083.]

202

**Butler & Snow**, of Jackson, **Engle & Laub**, of Natchez, **Ackland H. Jones**, of Woodville, and **Sholars & Gunby**, of Monroe, La., for appellants.

Wells, Wells, Lipscomb & Newman, of Jackson, Brandon & Brandon, of Natchez, Young & Watson, of St. Joseph, La., and Mason Spencer, of Tallulah, La., for appellee.

Argued orally by **George Butler**, for appellants, and by **Gerard Brandon**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

During the summer and fall of 1937, appellee cut and removed the merchantable timber, or a considerable part thereof, from what is known as Diamond Island Towhead, which is situated immediately west and north of the present main channel of the Mississippi River, opposite the lower part of Warren County, Mississippi. Appellants claim the land and the timber thereon through Louisiana title sources, and that the land is located in Louisiana, and under such claims appellants brought an action by attachment in that state to recover of appellee damages for cutting and converting the timber. All the parties are residents of Mississippi, and appellee thereupon brought his suit in the county in this state of the residence of one of appellants, seeking to enjoin the prosecution of the action in Louisiana. On appeal we held in Sharp et al. v. Learned, 182 Miss. 333, 181 So. 142, 182 So. 122, that, taking the averments of the bill strongest against the pleader, the land is in Louisiana, and that such being the case, there was no equitable basis for the injunction sought.

On remand appellant amended his bill, and on the second appeal, Sharp v. Learned, 185 Miss. 872, 873, 188 So. 302, it was concluded that the averments of the amended bill were sufficient to locate the land in Mississippi, and that if, upon the hearing on the merits, such was found to be the case, the injunction would be properly allowed.

The case, upon its return to the trial court, was heard on the merits, the injunction was granted, and the cause is here again upon the facts as shown by the proof.

Appellants make the preliminary point, that appellee has shown no adequate title in himself even if the lands are in Mississippi. This point is not well taken, for if the lands are in Mississippi, appellants have no title and, therefore, no concern as to whether appellee has any title, and no right of action against appellee in either state; and it is an action being taken against him by appellants that appellee seeks to enjoin. And this is true as to any such part of the land as in Mississippi.

The proof has consisted largely of maps, charts, and drawings, there being a large number of these, together with explanations made thereof by two expert witnesses, whose opinions in some material respects do not agree. The difficulties in the case have arisen out of the fact that in the 120 years from the date of the admission of this state into the Union until the time of the alleged conversion of the timber, the Mississippi River at the point in question has changed its main channel, either through the process of erosion and accretion or else by avulsion, so materially and so often that it now presents a perplexing problem as to where exactly was the territorial line between the states as regards this particular piece of land in 1937. And that is an issue which necessarily must be adjudicated as between these private litigants, even though such an adjudication would have no force so far as concerns the two states as sovereign states.

It is impracticable, if not impossible, to reproduce these maps, and charts and drawings or any one of them as a

part of this opinion, and, therefore, any extended discussion of the manifold details presented would be of no service except to those immediately engaged in the case, and as to them a summary of our conclusions will be sufficient. This, then, is all that we shall undertake herein. We preface the summary, however, with the statement that we have applied, in our consideration of the many maps and charts introduced, the established rules found in the text-books on that subject, and have allowed such inferences to be drawn therefrom as are reasonably permissible in the light of the expert testimony dealing with them and in view of the force carried by the findings of fact implicit in the decree of the trial court.

And in the matter of substantive law we have applied the four rules upon which the authorities are in general agreement, as follows:

(a) Territory transferred from one side of a boundary river to the other by a gradual process of erosion on one side and accretion on the other becomes a part of the state to which it is added.

(b) Territory transferred from one side of a boundary river to the other by avulsion continues to be a part of the state of which it was originally a part.

(c) Accretion or alluvion is an addition to riparian land made by the water to which the land is contiguous, so gradually and imperceptibly that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on.

(d) Avulsion is a change in a boundary stream so rapidly or so suddenly made, or in such a short time, that the change is distinctly perceptible or measurably visible at the time of its progress. Or to state it otherwise, so far as concerns practical purposes, when the change is not by accretion, it is by avulsion.

And in dealing with those issues we have also applied what the expert witnesses, taking their testimony as a whole, have affirmed, namely, that the alluvion formed by the accretion will be found, as an ordinary rule, to run

along the shore in what may be roughly termed parallel lines as related to that shore—from which it would follow that if within a comparatively short period of time there is found to have been a remarkable departure from that rule, the inference would be that there had been an avulsion, in the absence of countervailing or explanatory evidence covering the period of time in question.

Under the foregoing rules and after an extended examination of this record, we have concluded:

(1) That the line between Louisiana and Mississippi as it existed in 1817, the year of the admission of this state into the Union, was approximately that which is shown between the meander lines of the official township and section surveys of 1826-7 and 1830, or approximately by the solid purple lines on the small map attached as "Appendix A" to appellee's brief.

(2) That by the process of gradual accretion and erosion the Mississippi line had moved westwardly by nearly a mile, so that, in 1861, the line between the states was as shown by the broken green lines on the said small map Appendix A, representative of the Humphreys map of that year. This line did not embrace as being then east of the river the land which constitutes the island next hereinafter referred to. That land was in 1861 to the west of the river and on the Louisiana side.

(3) That between 1861 and 1874, the latter being the year in the latter part of which Major Suter's reconnaissance map was made, no substantial changes occurred in the river at this point, except that the river had divided into two channels, one of which went around and formed an island of the approximate size and shape as that which is marked "A" on the small map, Appendix A heretofore referred to.

(4) That the divided channel which went around this island to the north and west thereof was the product of an avulsion and did not occur through the process of accretion. It is possible that this occurred as a result of the great overflow in the spring of 1874 of which Major Suter

speaks in his report. Be that as it may, the oral proof demonstrates that this island was never detached from Louisiana by the process of gradual erosion and accretion. Betty Morton testified that she lived on this island and that her recollection thereof extends back to about or before 1880. She said she lived there in what was then an old house, and the witness Russ who from 1900 to 1904 saw the remains of the houses, said they had the appearance of having been slavery time houses. Photographs of these remains tend strongly to substantiate the stated facts. Had the progress of the river from 1861 to the northern and western channel around this island as it existed in 1874 been by gradual erosion and accretion, those old houses, and all traces thereof, would have disappeared.

(5) That in the year 1878, when the next map was made, and this by the Mississippi River Commission, the north and west divided channel around the island had well begun to fill up, and the subsequent maps show that from 1878 down to the map of 1895-6, designated as the "Ozalid Print of Mississippi Low Water Survey," made by the commission, the process of gradual erosion from the Mississippi side and accretion to the Louisiana side had occurred so that there had been a recession to the south and east whereby the south bank of the river in 1895-6 was near the south part of Section 5, crossing into Section 7 at the northwest corner thereof, thence across the north part of Section 7 to the line of the property now particularly in dispute, leaving part of Section 5, all of Section 6, and nearly all of Section 7 in Mississippi territory, as well as the former accretions to the Mississippi side still remaining to the south and east of the 1895-6 line. The above references are to the original township and section survey of Township 14 N., R 2 E., of Warren County.

(6) That the next chart or drawing made by the Commission in 1908 shows that within the short space of twelve years the north bank of the river was, at one point,

approximately a mile below the south bank as it existed in 1896. Moreover, the approach from the north in 1908 as compared with 1896 tends to show a cutting across, but if this could be reconciled, the line of the river in 1908, where it reaches what was the south bank in 1896 on the west, cuts squarely across the 1896 river lines— almost at right angles. This, upon the present record, cannot be reconciled with the rule of parallelism heretofore mentioned, which leads to the conclusion that the location as it existed in 1908 was the result of an avulsion and not by gradual erosion and accretion. It may be that there are living witnesses who are available and who, by their own personal knowledge and distinct recollection, could show that the change from 1896 to 1908 was by accretion and not by avulsion, but no such witnesses were produced, with the result that upon the record, as it now stands before us, the territorial line is that shown by the chart of 1895-6, with the further result that a part of the land in controversy is in Louisiana and part is in Mississippi.

This leads, then, to what is the ultimate question so far as this appeal is concerned, and that question is: Shall these parties, being all residents and citizens of this state, be permitted to litigate in Louisiana the damage issue as to all this land, or shall they be required to submit that controversy in its entirety to the courts of this state?

The authority of a court of equity to restrain citizens of the state from prosecuting in another state an action against a citizen of the home state of all the parties is well established, but, as stated in 28 Am. Jur., p. 392, Section 207, Injunctions, the power is sparingly and reluctantly exercised and the relief is not granted except for grave reasons and under very special circumstances. Counsel for both sides have stated that after a diligent search they have been unable to find a case in precise point upon this question when compared with the factual situation here presented.

It has long been a cherished policy in this state, and to which its citizens are required to give allegiance, that all questions or issues germane to any principal issue in litigation between the parties shall be settled, if possible, in one and the same suit, and this is particularly true as respects our courts of equity. Here the principal issue, to which the others are subsidiary, is where was the territorial line between the two states at the time of the alleged conversion. A voluminous record has already been built up by the parties in the present case in the chancery court in this state, and at a heavy cost to them. Under the ancient jurisdiction in equity in respect to boundaries, and the power therein to settle all issues, appellants may file a cross-bill in the present case for their recovery in damages or for conversion, and they, as well as appellee, may proceed to a further development of the facts, if competent witnesses may be found, upon the said principal issue; and since that issue must be decided by one court, not by two, and may be done in the present case at a large saving of labor and expense, which in itself is a point worthy of some consideration, although not enough if it stood alone, we are of the opinion that the situation here is within what has been termed the very special circumstances under which the injunction prayed for and allowed may properly be sustained.

The decree recited nothing which purported to make any final adjudication of title, or ownership of the timber, or as to the location of the territorial line. So far as the decree discloses, the chancellor may have been of the same opinion as that set forth in our summary of conclusions, —he filed no separate, written opinion. It is conceded that appellee is amply able to respond to any judgment rendered against him, and the decree is simply an injunction against the prosecution of any action by appellants in Louisiana, and as such it will be affirmed.

Affirmed.