UNITED STATES GYPSUM CO. *v.* REYNOLDS *et al.*

(In Banc. June 5, 1944.)

[18 So. (2d) 448. No. 35615.]

Wynn, Hafter & Lake, of Greenville, and Sillers & Roberts, of Rosedale, for appellant.

646

648

Farish, Keady & Branton, of Greenville, for appellees.

654

Argued orally by **W. T. Wynn** and **Walter Sillers**, for appellant, and by **W. C. Keady**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

The original government survey and the township plats based thereon made in 1829 were such that Section 3, Twp. 16 N., R. 9 W., and Section 10, Twp. 17 N., R. 9 W., in Washington County, abutted upon and were riparian to the Mississippi River, the river being to the east and southeast of the sections. The stated directions as bearing upon these two sections had happened because to the southwest of this location, the river had departed from its general southerly course and had made a sharp bend to the east and northeast, the bend being in fact almost in the shape of a large letter U, or, as sometimes called, a horseshoe bend; and the sections named were on the east inside of the bend and in such a situation as to make the river their boundaries on the east and southeast sides as stated. Section 3 is adjoined by Section 10, the latter

being to the northeast of Section 3, and both are irregular or fractional sections.

In the years from 1829 to 1858, inclusive, a period of thirty years, the river bed opposite these sections had gradually moved to the south and east, so that at the bottom of the U in the bend, the river had receded to the southeast about a mile, and opposite Section 3 had receded to the east a lesser distance, and opposite Section 10 a still lesser distance, the general shape and correspondence of the bend being preserved.

In 1858 there was an avulsion by which the river cut across the bend, cutting the U in half and making a complete departure from the directions which the river had theretofore followed at that immediate location. In this avulsion the lower half of Section 3 was washed away and became a part of the new river bed, and what in that year had been the river to the east and southeast of Sections 3 and 10 was wholly abandoned by the new river, and became in the course of a few years dry land, or land in place, except that part now called Lake Lee, a small portion of which is opposite Section 10.

Appellants, as the record owners of Sections 3 and 10, filed their bill seeking to have established their ownership of the accretions properly apportioned which became a part of said sections by the gradual movement of the river during the thirty-year period from 1829 to 1858.

There is no dispute between the parties upon the present record that the river was located in 1829 as shown by the lines in blue on the superimposed map, Exhibit 7, made by the engineer Richardson, and no dispute that the location in 1858 is as shown by the orange lines on that map,—affirmatively evidenced by map Exhibit 5, and Miss. River Chart No. 40,—and no argument has been made by appellees that the accretions between the middle, the thalweg, of the river of 1829 and that of 1858 have not been properly apportioned by the engineer as shown on his map, Exhibit 1.

The main question, and the determinative question so far as the present appeal is concerned, has arisen out of this: No authentic survey was made of the river and its movements at this point between the years 1829 and 1858. There is no map in the record showing precisely what happened there between those dates, and, of course, no witness is now alive who could directly tell about it. The contention of appellees, sustained by the trial court, is that there being no direct proof whether the river moved between those years by the process of gradual erosion and accretion, appellants cannot prevail because of the absence of such proof.

We cannot assent to that contention. The weight of authority, both state and federal, is that there is a presumption, founded upon long experience and observation, that a movement such as happened here between 1829 and 1858 was by gradual erosion and accretion.

In the absence of countervailing evidence, the presumption of gradual erosion and accretion prevails when the lay of the land, the length of the elapsed time as related to the distances of the movement, and the general correspondence of the location and directions of the river at the later period as compared with that of the earlier, are such that the stated presumption may be reasonably entertained, and the presumption is also that the river as it gradually moved its bed, carried along with it a water-covered width at ordinary stages approximately equal to its original width.

Precisely that situation was presented in the first phase of the recent case Sharp v. Learned, 195 Miss. 201, 14 So. (2d) 218. In that case, as here, there had been no authentic survey as to what had happened between the years 1830 and 1861, and, of course, no living witness, but the presumption was sustained that the movement by the river westwardly by nearly a mile during that thirty-year period was by the process of gradual erosion and accretion, the general situation being such as to satisfy the conditions as stated in the next preceding paragraph

of the present opinion. And that what happened in 1858 was an avulsion is supported by what was said as to the third phase in Sharp v. Learned, 195 Miss. 201, 14 So. (2d) on pages 220, 221 under numerals (6) and 6, and this is even more evident here than in that case.

The testimony of the highly competent civil engineers, all or practically all of which was relevant and admissible, who made a close study of this location and all its physical indications, sustains the validity of the presumption of gradual erosion and accretion in the case now before us as to what happened between 1829 and 1858, and before the avulsion in that year, but a study of the map, Richardson Exhibit 7, together with Miss. River Chart No. 40, is enough to sustain it. This map shows that the point of the greatest recession, about a mile, was at the bottom of the bend or U. Considering what had been taking place in clearing and ditching in the vast area above, tributary to the river, during that thirty years, the nature of the sandy and alluvial soil in the particular area here in question, the size of the river there and the force of its currents, it would not be unreasonable to expect that the water at highwater periods, and even when not extremely high, as it came rapidly southward would surge against the bank at the bottom of the bend or U and would gradually scour this south bend bank and at a rate which in a year's time would amount to as much as 200 feet, and which in thirty years would be 6,000 feet or more than a mile. And it would be expected that the force of the current directed strongest against the bank at the bottom of the bend would gradually have less force and would gradually eat away less of the bank as the water was forced to take direction into the east and northeast reaches of the bend and would to the northeast finally get back into the river as it was, and the map, reasonably interpreted, shows this and all this. And as stated, the general course of the river at the point in 1858 was the same as in 1829; the feature of parallelism, spoken of in

Sharp v. Learned, was distinctly preserved, until the avulsion, called the American Cut-off, occurred in 1858.

The evidence placed before the court by appellants was sufficient to disclose, in the absence of any other, that the location of the river in 1858 as compared with that of 1829 had been through the process of gradual erosion and accretion and that appellants, under applicable rules of law, were entitled to the accretions claimed, when correctly apportioned. Therefore, the motion to exclude the evidence should have been overruled.

Reversed and remanded.