ROBINSON, et al., APPELLANTS *v.*
HUMBLE OIL & REFINING COMPANY, et al., APPELLEES

No. 43476 June 14, 1965 176 So. 2d 307

October 11, 1965 178 So. 2d 863

*Satterfield, Shell, Williams & Buford, Morse & Morse,* Jackson, for appellants.

*L. V. Russell, M. M. Roberts,* Hattiesburg; *Eaton, Cottrell & Lang,* Gulfport; *Dent, Ward, Martin & Terry, Teller, Biedenharn & Rogers,* Vicksburg; *Gwin & Gwin, Brandon, Brandon, Hornsby & Handy, Laub, Adams, Forman & Truly,* Natchez, for appellees.

606

PATTERSON, J.

This suit involves title to approximately 83 acres of land, and certain oil royalty payments therefrom, in Adams County lying between the present bed of Second Creek, a sizeable stream, and the old bed of the stream as it was alleged to have been located in 1885. The basic issue to be determined is the location of the eastern boundary of the complainants' land and the western boundary of the defendants' land, the same being contiguous.

The complainants and cross defendants, John and Frank Robinson, Jr., are brothers who own without dispute the land west of Second Creek, but who claim, by this suit, that their eastern boundary is east thereof to the old bed of Second Creek as it is charged to have been located in 1885. J. L. Tillery, complainant and cross defendant, is a grantee of an undivided mineral interest from the Robinson brothers. The defendants and cross complainants own without dispute Berkley Plantation to the east of Second Creek as it was alleged to have been located in 1885, but presently defend and claim by cross-

bill that their western boundary extends to Second Creek at its present location. There are more than 100 defendants and cross complainants who claim their respective interests through the owners of Berkley Plantation. Hereinafter the complainants and cross defendants will be referred to as Robinson and the defendants and cross complainants as Berkley.

Humble Oil & Refining Company is the lessee of oil, gas and mineral leases from the property owners on both sides of Second Creek. Their interest in the suit is that of a stake holder as to the suspended royalty payments during the pendency of this suit. Their lease interests are not in controversy in this suit.

After a lengthy hearing, the court entered a decree finding the thread of Second Creek as it is presently located to be the western boundary of Berkley Plantation and the eastern boundary of the Robinson lands. The bill of complaint therefore was dismissed and the cross-bill sustained confirming title in the owners of Berkley and their grantees. From this decree complainants appeal, designating as their principal assignments of error the following:

(1) The court erred as the decree rendered is against the overwhelming weight of the evidence.

(2) The court erred in excluding the testimony of John Robinson as to matters prior to the death of his parents.

(3) The court erred in sustaining objection to the testimony of possession as against the remaindermen claiming under the will of Anna F. C. Martin.

(4) The court erred in adjudging the cross complainants to be the owners of the land and royalties in disputs.

(5) The court erred because the decree rendered herein deprives the complainants, appellants, of their property without due process of law, and deprives them of substantive rights without due process of law, contrary

to article 3, section 14 of the Constitution of the State of Mississippi and contrary to amendment XIV of the Constitution of the United States of America.

These assignments necessitate a review of the parties' contentions as well as the evidence.

Robinson contends that the movement of Second Creek westward from the 1885 line was by an avulsion and that his eastern boundary remained at the former bed of the stream rather than moving westward with the stream by avulsion. Robinson contends further, if in error in the foregoing, that in any event he has held to the bed of the stream as it was in 1885, and under color of title, and that he has obtained title thereto by adverse possession.

Robinson's chain of title begins with a partition suit in 1885 which awarded to Amanda Hargraves Lot No. 5 which was described as:

Begin at (6) on the map and the S. W. corner of No. 3 on Est. boundary of No. 4, thence south 24 chs. (8) on the map stake whence Pine Oak X// 30" dia. S. 13½ E. 28½ feet and a Pin Oak X// N. 45 W. 11½ feet. Thence N. Thence along the road S. 1 degree E. 6.00 chs. to (15) on the map made corner on forket Oak X// on top of a high bank on East side. *Thence N. 89½ E. about 58 chs. to Second Creek* (17) *on the map, a stake whence a sycamore "No. 8 X B. T." bears S. 4 degrees W. 26½ feet, thence up the creek to S. E. corner of Lot No. 3 S. 89½ W. 86 chains to the beging* (sic), containing 280 acres. (Emphasis added.)

Mary E. Ligon obtained Lot No. 3 in this same partition suit which was described as follows:

Begin at S. West corner of Lot No. 2 previously mentioned. Thence with Buckhurst line S. 2 degrees W. eleven chains to a small walnut X// for a corner on the West side of an old road. Thence with the line of Lot No. 3 and No. 4 N. 89½ E. 35.00 chains

to a Hackberry X// for a corner whence a gum 30 in. X// N. 60 W. O. 36 lks. (5) on the map. Thence between No. 3 and No. 4 South 21 chs. to (6) on the map a post whence a Pine X// S. 9 degrees E. 107 lks and cluster of Oaks X// S. 6¼ W. 118 lks, *thence between No. 3 and No. 5 N. 89½ E. 86 chs. to Second Creek below the mouth of a Bayou whence a cotton Wood X// South 3½ feet (18) on the map. Thence up the creek to the S. E. corner of No. 2 previously mentioned,* thence with No. 2 and around the Home lot to the beginning, containing 270 acres. (Emphasis added.)

Thereafter Amanda Hargraves conveyed to Melissa Mazique Lot 5 on December 1, 1886, by deed which described the land conveyed as:

Lot No. 5, as designated on the Map accompanying the report of Special Commissioners appointed by the Chancery Court of Adams County, Miss., in partition suit on the General Docket of the Court, and containing 280 acres, more or less, and being the same lot allotted to Amanda Hargraves in said cause No. 873 and conveyed to Melissa Mazique by deed in Book AAA Page 439.

About this time Mary Ligon conveyed approximately 13 acres of Lot 3 of said partition to Cavanaugh Mazique. Thereafter Melissa and Cavanaugh Mazique gave a deed of trust to the National Bank of Commerce wherein A. H. Geisenberger was named as trustee. This deed of trust was foreclosed by the trustee and a trustee's deed was executed to Adolph Jacobs on September 2, 1911, which described the property as follows:

Lot No. 5 as designated on map accompanying the report of the Special Commissioner appointed by Chancery Court of Adams County, Miss., in the partition suit numbered No. 873 on the general docket of said court; said lot No. 5 containing 280 acres, more or less, and being the same lot allotted to Amanda

Hargrave in said cause No. 873 and afterwards conveyed to Melissa *Mazycque* by deed recorded in deed book 3-A, Page 439; the commissioners report being recorded in Deed Book ZZ, Page 580.

That certain 13 acre tract bounded on the South boundary of Lot No. 3, as shown by the commissioners report in said cause No. 873; the East bank of Meadville and Natchez Public road and the bank of Second Creek, which said thirteen acre tract conveyed to Cavanaugh *Mazycque* by Mary E. Ligon by deed recorded in Book 3-A, Page 306; save and except two acres of said tract which were conveyed by Cavanaugh *Mazycque* to Harvey Ranson by deed recorded by deed recorded (sic) in Book 3-T, page 188.

Shortly thereafter Jacobs conveyed the property to J. B. Banks by substantially the same description as in the trustee's deed. Banks died, leaving the property to his widow who thereafter conveyed by deed of May 2, 1936, to Frank and Alberta Robinson Lot No. 5 and 13 acres off of Lot No. 3 by substantially the same description as used in the trustee's deed to Jacobs which is hereinabove set out in detail.[1] Frank Robinson died intestate on December 3, 1941, leaving as his heirs Alberta Robinson, his widow, and John and Frank Robinson, Jr., his sons, who inherited from him his one-half interest in the land. Alberta died intestate October 11, 1958, leaving as her sole heirs the two sons, complainants herein, who inherited from her the remaining interest in the land.[2]

---

[1] The changes in the last deed are only to the extent that the paragraphs are designated by number, and a reference to the trustee's deed to Jacobs is incorporated within the Jacobs to Banks deed.

[2] There are numerous deeds of trust, a tax sale, a quitclaim deed and numerous mineral leases and assignments, royalty transfers, pooling agreements, etc. too burdensome to be set out in full, which have varied descriptions. The conveyances above-mentioned and the descriptions therein are the paramount conveyances concerning this suit.

Berkley contends the center of Second Creek as it now exists to be the western boundary of the plantation and it denies complainants' theory of avulsion and adverse possession.

The chain of title of Berkley Plantation is admitted as is the description thereof, the calls of the deeds not being necessary except the following, which describes the western boundary thereof:

On the west by Second Creek; and containing 1350 acres being the same land as set forth in that certain deed from Stanley Carter Schuler to Myra Blake Schuler dated March 29, 1938 and recorded in Deed Book 4-W at page 225 of the Deed Records of Adams County, Mississippi.

The deeds in the chain of title of Robinson indicate the eastern boundary of this land to be Second Creek and it is so alleged in the bill of complaint. The deeds in the chain of title of Berkley Plantation, though limiting the acreage thereof to 1350 acres, designate its western boundary as being the same Second Creek.

Since 1885 there have been changes in the location of the creek and its present location is to the west of the 1885 location. This westward migration of the creek and the discovery of oil on the lands in question precipitated this lawsuit. The two principal questions for determination are:

(1) Did the location of the creek change suddenly by a natural avulsion or by an avulsion aided or caused by drainage work and digging to direct the creek in a new channel, or an avulsion from either cause or both so that by law the boundary of the properties remained at its location prior to the avulsion or avulsions?

(2) Or, in the alternative, in the absence of proof of avulsion did the western boundary of Berkley follow the western movement of the stream by accretions to the east bank thereof or did Robinson hold to the old bed of the stream as it existed in 1885 by adverse pos-

session for the statutory time regardless of the western movement of the live stream?

In support of their allegations as to there being an avulsion and as to adverse possession the complainant introduced the following witnesses whose testimony is summarized following their identity.

The first witness, Mr. W. L. Ball, owns 200 acres of land immediately north of the Robinson property which he acquired in 1938. This witness testified that he had no knowledge as to whether any of the Robinson land extended east of Second Creek, but that the land of Claire Mazique, which was just north of his property, and on which he measured cotton in 1933, extended east of Second Creek. He recalled when the Robinsons moved to their land in 1936 and stated that one of the tenants of the Robinsons was Dave Ely.

Mr. Charlies H. Perrault, Jr., a defendant, was called as an adverse witness, but was realligned by the court as a complainant when it was discovered that his interests were identical to that of the Robinsons. His testimony was largely to the effect that he saw crops growing on the land in question, and that there were two fences on the property. He did not know to whom the crops belonged nor could he with certainty give the location of the fences.

John Robinson, one of the complainants, was next called and testified that his father died December 3, 1941, and that his mother died October 10, 1958. An objection was sustained to the witness's testifying as to any matters preceding the death of his mother on the theory that it would establish a defense to the cross-bill filed by the defendants in violation of Mississippi Code Annotated section 1690 (1956). He testified that since 1958 he had farmed, cut timber, and maintained a fence "over there." He testified further that no one had adversely claimed the land since 1958 until the cross-bill was filed in this suit, and that the east boundary of his property

was the bed of the old creek which was fenced on each side. He described the old creek as being ''just as mother nature has left a bed there.'' He testified that in 1962 he cut $844.58 worth of pulpwood from this land.

The next witness, the wife of John Robinson, testified that she had knowledge of the property since 1951 when she moved there with her husband. Her testimony was that the property east of Second Creek was farmed by her husband and that the old creek bed was the eastern boundary line, and that to her knowledge no one had interfered with their possession of it since 1951. An objection was interposed to all of this testimony on the ground that some of the defendants were remaindermen and that the possession of the complainants after 1942 would not cause the statute of limitations to run against them. The court reserved its ruling on this point.

The next witness was Edgar Rounds, a colored man, who was familiar with the property since 1884. He testified that he had lived there nearly all of his life; that as a boy he played on the creek, swam, caught fish and turtles there. He knew the property when Cavanaugh Mazique owned it and when Jim Mazique, Cavanaugh's brother, lived on the property and farmed it. He stated that there was a sudden change in the creek many years ago and, in his words, ''When that flood water come, that throwed a good part of Mr. Blake's land, Berkley, on the west side of the creek and on down the creek further it throwed a good part of Robinson's land on the east side of the creek,'' and that Cavanaugh Mazique [3] continued to farm the land which had been thrown across the creek to the east. He identified this sudden change as having occurred prior to a cyclone or storm in 1906 or 1907 which remained vivid in his mind. His testimony was to the further effect that the old creek ran right to the edge of Berkley Hill and that you could presently see where the old creek was, and that when Cavanaugh

---

[3] One of complainants' predecessors in title.

Mazique owned the property, it was fenced on the west side of the creek by Cavanaugh and on the east side by the owners of Berkley; that the fences ran up and down the creek. He identified Clitus Michael and Alex Fitzgerald as being two tenants on Robinson's place, but he could not be specific as to the time. He also testified that he bought hay from the Robinsons from across the creek in about 1938 and that the land had "laid out" for about 15 years prior thereto.

George Jones testified that he was born in 1881 and that he had known the property for many, many years. He testified that the creek made a sudden change and that Cavanaugh Mazique went across the creek and farmed it; that a man by the name of Sylvester "took a plow and ran some furrows" and that the creek changed and went straight down. On cross-examination this witness identified the property he was talking about as being the Ligon-Mazique property which was north of the Robinson property here in question.

The next witness was Forea Mazique, Jr., who has lived on the Robinson property for the past 27 years and is familiar with it though he only farmed it in 1957 and 1958. He testified that he operates a small store near the property and has furnished tenants who have farmed the area across the creek every year since he has been on the place. He states that the bank of the old creek was against the hills on Berkley's side and that Berkley's west line was the old creek. He further testified that each year as far back as he could remember Berkley Plantation had been cultivated and pastured by its owners. He stated that the creek bed been located as it is now since he could recall, but that it caved some to the west due to the washing each year when they had floods.

Horace Fitzgerald was next called and testified that he was familiar with the property since 1938 and that he worked on the Robinson land from 1940 until about

1949 and that he moved on the property in 1949 and lived there until 1959. He testified that the Robinson property ran eastward to the old creek bed and that he and other tenants raised corn, hay, and gathered pecans "over there across the creek." On cross-examination he testified that the land he worked "over there" was approximately six acres in the middle of the island and that this same patch was worked by Dave Ely, Forea Mazique, and others; that there were not over six or seven acres farmed on the island. He also recalled that the timber was cut in 1947 or 1948 and was hauled off on the Berkley side. He testified further that Berkley Plantation was cultivated and pastured each year.

Forea Mazique testified that the old bed of the creek was right at the foot of the hill at Berkley. He identified Horace Fitzgerald, Clitus Michael, and Alex Fitzgerald as tenants who worked for Robinson at various times on his land. He testified that the Robinsons and their tenants worked some of the land on the east side of the creek. This witness also testified that a man by the name of Sylvester Lyles dug some furrows that caused the creek to make a sudden change when it overflowed, but he did not identify this occurrence as to time.

August Mazique was then called and testified as to the dividing line between the properties in question. "The old dividing line come right down the hill and right under that it turned to the left and used to be fenced in on each side. After that cave got in there, there was no fence on the west side at all." He further testified that there were old wires in the trees on the west side of the old creek and that the Berkley fence is kept up on the east side as it was in old days. He further testified that there was a sudden change in the creek, but he did not know when except to say that it was during the time when his father, Cavanaugh Mazique, owned the property. On cross-examination he testified that the big floods caused

the creek to cave on the west side and that this caving is still going on at places.

John B. Robinson, a party to the suit, was recalled as the next witness. He introduced an aerial photo of the area dated April 1952 which was made by the United States Department of Agriculture, and which, according to the witness, shows all of the land that is here in dispute. The witness testified that from the date of his father's death in 1941 (the court sustained an objection to testimony prior to that time) to the present there was very little variance in that which was depicted on the 1952 aerial photo and the conditions as they existed in 1941, that is, the same cultivated areas, woodlands, etc. were shown on the 1952 map as prior thereto. The witness further testified that to his knowledge no one had cut the timber on the land except himself. He then named the tenants who had been on his place, Alex Fitzgerald from 1942 to 1946; Minor Coleman, 1946 to 1949; Dave Ely, 1953 to 1956; Forea Mazique, 1956 to 1958; Horace Fitzgerald, 1957 to 1959; James Washington, 1949.

As opposed to this testimony, the defendants and cross complainants introduced the following witnesses:

Loretta Williams, approximately 71 years of age, who had lived on Berkley Plantation all of her life except about 5 or 6 years, and who testified that her father, Ike Jones, cleared or cleaned up the bottom land back of his house to the creek, and that her uncle and grandfather also worked in the bottom, farmed in this same area, and they farmed west to Second Creek, and that what is now Robinson's place is over across the creek; that her father, her uncle, and her grandfather were all tenants of Berkley, and that after her father left, other tenants lived in the same house and farmed the same bottom land. This witness further testified that "Old Man" Jim Mazique farmed the land over there at one time, but that his cultivation did not go up to the foothills of Berkley Plantation; that the creek divided the two

and that she had hoed cotton and corn for the Maziques prior to her marriage in 1916 across the creek and that she had never seen an old creek bed in there.

The next witness, Mr. R. D. Foster, an employee of the Natchez Hardwood Company, testified that his company cut the timber on Berkley Plantation beginning in 1947 and continuing for 2 or 3 years; that they cut all over Berkley Plantation to the western portion thereof which was Second Creek and that they cut without interruption from anyone; that he cruised the timber prior to its being cut and that during the cutting he was out there two times a month to supervise the cutting and removal of the timber and that since this litigation started he has been back to the area; that in the years mentioned they cut timber on the land that is now in question. He further testified on cross-examination that he did not see any evidence of row crops at the time of the cutting; that most of the area was in woodland with perhaps a little farming ground there, and he saw no evidence of an old creek bed there.

The next witness was Johnny Lishman, a logging contractor, who testified that he worked as a logger in 1947 as an employee of his father who was a logging contractor, and that they cut over Berkley Plantation over to Second Creek, that is, the flowing stream, and that he again logged this area in 1953 and that they again cut to Second Creek, the flowing stream; that during this cutting operation, which extended over a period of from four to six months, they used all types of logging equipment, caterpillars, trucks and loaders; that there was nothing secretive about it, and that their cutting operation was not objected to by anyone. On cross-examination this witness could not recall any cultivation being in the area east of the creek.

The next witness was Curtis R. Huff, Jr., a consultant forester, who surveyed the area in question with two assignments in mind, the first to estimate the age of the

oldest timber situated on that area immediately west of the bluff and east of Second Creek and to make a similar sample of the age of the oldest timber immediately east of drilling unit No. 7. The second assignment was to estimate the species, the amount and value of the timber which had been removed through harvesting the last year. The witness testified that he made his beginning point near the mid-point of the survey line made by Montgomery in 1951 and that from this area he moved in a southwesterly direction for a distance of about 250 feet where he found timber, primarily elm and locust, with an age of from 61 to 82 years, and that continuing in a southwesterly direction he found pecan, elm, oak, with estimated ages of 41 to 60 years, and that as he continued in this direction he found timber varying in age from 1 to 2 years along Second Creek up to 40 years of age. This witness further testified as to the topography of the land; that between the foot of the bluff and Second Creek there is a flat or flood plain or extreme bottom land; that the land near the bluff was higher than that next to the creek. He further testified that the species of trees follow a general pattern according to the species of the soil; that within the alluvial deposit the usual succession begins with the pioneer species, willow or cottonwood, and that as the soil grows to maturity it is succeeded by elm, pecan and sycamore, and that this occurs after the soil becomes firmer and a little more sediment or more organic matter is deposited in the upper portion, and as the soil ages, other types of trees such as oak, cherry, ash and sweet gum follow in succession. He further testified that in the area between the bluff and Second Creek there were two distinct ages of soil, the youngest or first being nearest to Second Creek which has a very high sand content with not too much firmness or top soil. He first designated this soil as being very young or new soil; he said that as you go toward the bluff from the creek there is more mature

soil which is now supporting elm and pecan trees, and this soil appears to be older; it has more maturity than that near the creek. This witness found no indication of an old creek bed, but testified that there was an old drain at the foot of the bluff which drains the hills to the east of the area in question. His examination of the stumps revealed them to be of recent cutting. (Evidently this refers to the cutting that was made by Mr. Robinson in 1962.) On cross-examination this witness testified that he did see some evidence of cultivation in the area; that he did not know how much was in cultivation, and refused to testify as to that. He was positive the soil between the depression at the foot of the bluff and the stream was that which was deposited by a stream. It was not a parent soil.

Austin B. Smith, a civil engineer, with many years of experience in his profession and who is presently employed as an engineer by the Mississippi River Commission, and who has had much experience with channel and cutoff problems on the Mississippi, the Arkansas, Red River and numerous tributary streams, testified next for the defendants. He testified that he had been employed to make an examination of the Second Creek area that is in dispute and make an engineering stream study of the stream's action and determine to the best of his ability how the lands in question were formed and to prepare a report setting forth his findings and conclusions as to this question. The heart of the problem presented was to determine the genesis of the lands in question. This witness made an extensive investigation of the area and background material which included the official records, the deeds, topographical maps, aerial surveys, and soil borings. From this background information this witness introduced numerous maps and other data compiled by him which indicate that since 1886, according to his testimony, the stream has meandered in a band of about 600 feet and that in some points

it is almost identical today to its location in 1885. He further testified that there was no cutoff by the stream in the area and he found no evidence of an avulsion of the stream. He was equally positive that there was no old creek bed in the area, but that there was an old drain adjacent to the hills of Berkley to the east. He concurred in the testimony of Huff, the forester, as to the makeup of the land between the present location of Second Creek and the foot of the hill at Berkley which, according to his statements, was that the younger soils were to the west, and became progressively older as they approached Berkley and this was borne out by the specie and age of the timber growths thereon. His conclusion was that the lands in dispute were formed as accretions to Berkley Plantation riparian lands; that this fact is documented by the meandered data, accretion information, bank line of maximum recession data, channel trace data, positive proof that no "cutoff" appeared between 1886 and 1963 in the sector of the channel between points G and H on his exhibits 9, 11 and 13, and on-the-ground information, and finally on timber and soil data.

On extensive cross-examination, the witness reaffirmed that his exhibit No. 13, which is an overlay to his exhibit No. 11, was "very near" correct from a reconstruction of the descriptions in the old deeds which were used in conjunction with the other background data, particularly the aerial photographs.

E. T. Jeffreys, a consulting geological engineer, offered as a rebuttal witness, testified that he had made an extensive examination of the property, which included a physical reconnaissance, taking core holes or borings to examine the soil and the geological formations present, by flying over the area in an airplane to obtain a bird's eye view of it, and by examining the various aerial photographs, the deeds and the records that were introduced or referred to by the foregoing engineering wit-

ness. The witness testified that on his first day in the area that he took core holes from what appeared to be the old bed of Second Creek at the foothill of the escarpment or bluff on the east side, and found underneath the top soil in this depression a layer of gray silt, which the witness believed was deposited by Second Creek at the time it followed that course. He further testified that this gray silt was found only in this depression and that it was not present in the part that was cultivated, or beyond the hill, nor was it found even two or three feet out of the depression which appeared to have been the old river bed. He further testified that there was an avulsion of the creek around 1900, and that this was positively proven by the growth of timber which lay between the old creek bed and the present creek; that the creek had to avulse or it would have killed these trees if it had meandered across to its present position. He introduced his exhibit J-5 which indicates by a blue line the creek as the witness believed it to have been located in 1885 and 1886, which is considerably east of some of the trees which were depicted on the map of the forester. He further testified that he located a honey locust tree of great size and age in close proximity to other trees depicted on the map of the forester, but that this tree was not shown on the map. According to his testimony this tree is west of the old creek as he locates it, and from this he was positive that there was no accretion westward as it would have killed this tree. He testified further as to the avulsion of the stream; that Second Creek had been rejuvenated by virtue of engineering work on Homochitto River below, which increased the flow of the stream thereby causing cutoffs and avulsions. These were set out on his exhibit J-6. He testified that he was able to locate with reasonable accuracy, from the aerial survey and the data given on the plats in evidence as exhibits, the southeast corner of Lot No.

3 and that by reconstruction of the 1885 survey he was able to establish the approximate location of old Second Creek. According to his testimony, this reconstruction was accurate in that the old bank of the creek, to which Babbit made his survey in 1885, is easily discernible on the ground. [4]

John Robinson and Horace Fitzgerald were recalled in rebuttal, denied that either Foster or Lishman had cut timber on the land across the creek.

At the conclusion of the testimony the court, in compliance with a motion of the complainants, inspected the premises prior to rendering its decree, which was adverse to the complainants.

We are of the opinion that the first assignment of error, that the decree rendered is against the overwhelming weight of the evidence, is not well taken, both to the complainants' theory of avulsion and adverse possession. The law is well established that when a stream is the boundary between properties, this boundary shifts with the gradual vagaries and changes in the stream, but that if there is a sudden or avulsive change in its course, the boundary remains fixed to the location of the stream prior to the avulsion. See *Anderson-Tully Co. v. Tingle*, 166 F. 2d 224, cert. den. 59 S. Ct. 36, 335 U. S. 816, 93 L. Ed. 371 (5th Cir. 1948) wherein this rule is announced as follows:

> The law of Mississippi as to boundaries by freshwater streams above the ebb and flow of the tides is the common law, regardless of the size and actual navigability of the streams; and that law is that the owners of the land own to the thread of the current of the stream, assumed in the absence of other proof to be the center line of the stream; but that the boundary shifts with gradual non-avulsive changes in the

---

[4] The reconstructed surveys and other exhibits of Jeffreys and Smith vary to a great degree.

stream, so that an owner may lose or gain an indefinite area thereby.

■■ ■ The inquiry, there being no dispute as to the law on this point, reduced itself to a determination of the facts by the trial court, and this limitation narrows the scope of this Court's review to the ascertainment of whether there was credible evidence to support the findings of the chancellor since we abide by the oft-cited law to the effect that the chancellor as the trier of fact should not be reversed unless it appears that he was manifestly wrong. *Ellis v. Ellis,* 248 Miss. 483, 160 So. 2d 904 (1964); *Hastings v. California Co.,* 241 Miss. 160, 129 So. 2d 379 (1961); *Smith v. Van Norman,* 234 Miss. 526, 106 So. 2d 897 (1958); and *Osborn v. Thomas,* 221 Miss. 682, 74 So. 2d 757 (1954). The evidence was in sharp conflict as to whether there was an avulsion of the creek. Two of the complainants' witnesses, who had known the stream for many years, testified that there was a sudden change in its course, as did the geological expert, Jeffreys. However, the testimony of the forester and the engineer, both experts in their respective fields, and who examined the area in detail, was precisely to the contrary. The argument of the complainants that the presence of the old honey locust tree between the old creek bed, as established by Jeffrey's exhibit No. 5, and the present Second Creek is very persuasive and would be decisive of the avulsion theory if it were not refuted by the exhibits of the engineer, which placed the meander of Second Creek to the west of this particular tree. The chancellor could with logic accept or reject either of these exhibits as being correct.

■■ ■ In addition to hearing the evidence, the chancellor viewed the premises in question and determined that there was no sudden change or avulsion of the creek. We hold there was substantial evidence to support this conclusion and certainly we cannot state that he was

manifestly wrong in this regard, and particular so in view of *U. S. Gypsum Co. v. Reynolds,* 196 Miss. 644 at 659, 18 So. 2d 448 at 449 (1944) that:

■■ ■ In the absence of countervailing evidence, the presumption of gradual erosion and accretion prevails when the lay of the land, the length of the elapsed time as related to the distances of the movement, and the general correspondence of the location and directions of the river at the later period as compared with that of the earlier, are such that the stated presumption may be reasonably entertained. . . .

■■■ The complainants contend, however, under this assignment, that title to the lands west of the hill at Berkley and east of the present flowing stream was vested in the complainants by adverse possession under color of title in excess of the statutory period of 10 years. The evidence reflects, with two exceptions, that the complainants and their predecessors in title have used the area in dispute for many years in excess of the statutory period by cultivating six or seven acres across the creek, the perimeter of the lands cultivated not being described, by cutting hay therefrom, by gathering firewood, by selling timber, and by gathering pecans therefrom, the only exceptions we find to this continuity of possession being the cutting and removal of timber from this area in 1947 and in 1953. In view of these facts the complainants insist their use and occupancy of a portion of the area extended their possession to the boundaries as set forth in their 1936 deed of acquisition. The calls of that deed are substantially the same as were used in deeds from 1885 to 1936 wherein these deeds specify the eastern boundary to be the creek as described by reference to the partition suit of 1885 and the various deeds given in accordance therewith. The rule of possession, under color of title, of a portion of a tract of land extending such possession to the limits of the deed

is plausible and is well-established in our jurisprudence. See *Page v. O'Neal,* 207 Miss. 350, 42 So. 2d 391 (1949); *Bullock v. Greer,* 181 Miss. 190, 179 So. 264 (1938); and *Evans v. Shows,* 180 Miss. 518, 177 So. 786 (1938). However, this theory of law applies with equal weight to the defendants who, without dispute, continuously possessed, used and occupied Berkley Plantation down through the years far in excess of the statutory period, and their possession would also extend to the boundaries established by the calls of their deed, the western boundary of which was the center of Second Creek. The proprietors of Berkley were riparian owners with a vested right to the accretion to their property, and, we might add, the vested hazard of loss by erosion. Their possession of Berkley remained constant with its boundaries, one of which was the thread of Second Creek, and as the creek migrated or changed, so did the boundary, the two being coextensive. See *Anderson-Tully Co. v. Tingle,* 166 F. 2d 224, cert. den. 69 S. Ct. 36, 335 U. S. 816, 93 L. Ed. 371 (5th cir. 1948) supra; *Philadelphia Co. v. Stimson,* 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570 (1912); and *St. Clair County v. Lovingston,* 23 U. S. 46, 23 L. Ed. 59 (1874). See also *Sharp v. Learned,* 195 Miss. 201, 14 So. 2d 218 (1943), and *Wineman v. Withers,* 143 Miss. 537, 108 So. 708 (1926), our own decisions to the same effect. The record reflects that a portion of the questioned area was cultivated and used by the Robinsons each year which, as above stated, gives them constructive possession to the area within the calls of their deed. It also reflects that Berkley was cultivated each year which would also give to it constructive possession of the area within the calls of its deed. Assuming, but not deciding, that the position of complainants in asserting that the eastern boundary of their property became stabilized by reference to the partition suit of 1885 and was therefore not subject to subsequent lateral fluctuations of the stream, and there

are authorities to the contrary. [5] The assumption begets only overlapping possession which aids neither party. See *Lawrence v. Byrnes,* 188 Miss. 127, 193 So. 622 (1940) wherein it states:

Each side attempted to show adverse possession by actual occupancy of the triangular tract, but in this both sides failed. But appellants argue that inasmuch as they have been in the actual adverse possession for more than ten years of that part of Lot 3 of Share 1, the plat and description of which was made of record by the decree in partition in 1901, which lies south of the channel, as it then existed, and where it has continued to exist without change since that time, their adverse possession extends by construction to the involved triangular tract across the stream which was by the plat and decree aforesaid shown as a part of said Lot 3 of Share 1. The difficulty in the path of appellants in respect to this contention is that appellee was, and has been, throughout the same period in the actual occupancy and possession of a large and substantial part of Section 14 under a recorded deed to him as the owner of the entire section so that his constructive possession would extend to all of the section, wherefore we would simply have

[5] See Jefferies v. East Omaha Land Co., 135 U. S. 178, 10 S. Ct. 518, 33 L. Ed. 872 (1890):

. . . it justifies the view announced by the Circuit Court in its opinion, that where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary, and a deed describing the lot by number or name conveys the land up to such shifting line exactly as it does up to a fixed side line. . . .

These views result in the conclusion, that the side lines of lot 4 are to be extended to the river not as the river ran at the time of the survey in 1851, but as it ran at the date of the patent in 1855, and that all the land which existed at the latter date, between the side lines so extended and between the line of the lot on the south and the river on the north, was conveyed by the patent.

a case of overlapping constructive possession, which, of course, does not aid either party as against the other. (188 Miss. at 135.)

The description of the western portion of Berkley Plantation was definite in that it extended to the center of the stream. By contrast the description of the eastern portion of complainants' land, as urged upon us by the complainants, is indefinite and uncertain inasmuch as no one has definitely established the location of Second Creek as it existed in 1885. The constructive possession within the calls of complainants' deed is therefore vague and indefinite and as such is not subject to definite decision. We hold, therefore, that the trial court committed no error in finding that the complainants failed to prove title in themselves by adverse possession and in confirming Berkley's title to the present thread of Second Creek.

 We are of the opinion that the lower court erred in holding inadmissible evidence relating to events prior to the death of complainants' father and mother as the same was introduced not to defeat the rights of the estates, but was rather in behalf of the estates. *Ford v. Byrd,* 183 Miss. 846, 184 So. 443 (1938); *Cock v. Abernathy,* 77 Miss. 872, 28 So. 18 (1900); and *Sweatman v. Parker,* 49 Miss. 19 (1873). We are of the further opinion the court erred in not admitting the introduction of evidence which might have been against the remaindermen under the will of Anna F. C. Martin since the statute having started to run before the death of the owner, it would not be abated by her death. See *Leggett v. Norman,* 192 Miss. 494, 6 So. 2d 578 (1942). However, the complainants did not preserve these questions in the record so that we can consider their weight on appeal. See *Manning v. Hammond,* 234 Miss. 299, 106 So. 2d 51 (1958) wherein this Court held:

While we are of the opinion that the chancellor was in error in holding these witnesses to be incompe-

tent and in excluding their testimony, we cannot consider such error because it does not appear in the record what was proposed to be proved by these witnesses, and we are, therefore, not in a position to say whether the offered testimony would be material and relevant or whether its exclusion constituted prejudicial error. (234 Miss. at 307.)

We hold, therefore, these assignments of error are not well taken.

We are of the opinion the final assignment of error, that the decree of the lower court is violative of the Mississippi Constitution, as well as the United States Constitution, is not well taken as the record reflects the complainants were not deprived of any right and that they were accorded due process of law.

Affirmed.

All Justices concur except *Gillespie, J.,* who took no part.

## ON SUGGESTION OF ERROR

Inzer, J.:

 A majority of my brethren are of the opinion that the suggestion of error in this case should be overruled. Therefore, it must and will be overruled.

However, I would sustain it for the reasons herein set out. It should be stated at the outset that there is very little if any disagreement among us as to the fundamental principles of law involved in this case. We are in disagreement as to some of the facts and the application of the law to the facts.

After a careful study of the record in this case I am of the opinion that we were in error in affirming this case. The chancellor was manifestly wrong when he found from the evidence that there had been no avulsion of Second Creek. Our opinion in this case recognized the fact that in order for Second Creek to have changed

its location by accretion that its bed in 1885 must have been located somewhere west of the 100-year-old locust tree. All the evidence on this point reveals its location in 1885 to be east of the old locust tree, except the testimony of the witness Austin Smith. A careful study of Smith's testimony reveals that in order for him to place the bed of the stream west of the old locust tree in 1885 it was necessary for him not only to move the location of the creek 674 feet west of the point where Babbitt showed it to be located in 1885, but also to change the curve in the creek from an easterly direction as shown by Babbitt on his map to a westerly one. To allow him to do this is to allow him to discredit an ancient document. This is contrary to law and common sense. It is strange that neither Smith nor the witness Huff ever saw this locust tree prior to the time the witness Jeffreys revealed its location in his testimony in rebuttal on behalf of appellants. This tree was located near an oil well, and it should have been obvious to any person making an examination of the property in question. The testimony of Smith on this point is a clever and obvious attempt to bolster his testimony that there was no avulsion of Second Creek. I do not think that his testimony on this point is credible, and I am of the opinion it should have been disregarded by the chancellor and this Court. The fact that the chancellor viewed the premises after trial of this case is not sufficient reason to affirm his decision on this point because there was nothing on the ground that he could see that would reveal to him where the bed of Second Creek was in 1885.

I am also of the opinion the chancellor was manifestly wrong in holding that appellant had failed to prove adverse possession, and that we were in error in affirming such finding. This is true even though we concede that there was no avulsion of Second Creek. An examination of the partition decree rendered in 1885 reveals that the description used in describing the various lots

set aside to the parties, including Lots 3 and 5 involved in this case, was a metes and bounds description with distances and monuments. Each call in the descriptions that reached the bank of Second Creek went a certain distance to a stake on the bank of the creek and each stake had a marked reference tree. This established definite monuments at these points. It is true that the calls from the points thus established ran with the creek. However, we know from the oral testimony and from the aerial photographs in evidence in this case that if there was accretion involved that it occurred prior to 1936 when Robinson acquired title to his property by the same description that was used in the 1885 partition. After acquiring title Robinson went into possession of all property called for in this deed. Thus he was in possession under a deed which called for his land to extend to the points established by the partition decree of 1885. From that time up until the time of the trial of this case, Robinson and his heirs had remained in open, notorious, exclusive and uninterrupted possession of the property under the claim of ownership. They exercised all rights of ownership on the property that it was capable of having exercised on it, including cultivating each year a portion of the land. During this entire period none of the owners of Berkley Plantation ever made any claim to this land. In fact, so far as the record shows, they never made any claim until after oil was discovered. This case is unusual in that none of the owners of Berkley testified in this case. There is no evidence that they ever asserted any claim to this land or that they even now claim to be owners of it. The record reveals that their answer and cross bill was sworn to by one of their attorneys and not by any of the owners. The result of our decision has been to allow a fiction of law to prevail over actual adverse possession under color of title for a period of far longer than the statutory period of ten years.

It is clear from the evidence in this case that although it be conceded that there was no avulsion and no adverse possession under color of title, the decree of the chancellor affirming the title to all land in dispute in the appellees was error, and we were in error in affirming that part of the decree. This statement is based upon the fact that the proof shows without question and without dispute that appellants have cultivated a portion of this land from 1936 to the date of the trial. Our opinion seems to indicate this was only about six acres. However, the documentary evidence shows it to be a much larger area. In fact, one of the exhibits properly in evidence reflects the area cultivated constitutes about 27 acres. We indicated in our opinion that although proof establishes appellants had acquired title to this area by adverse possession, that the chancellor was justified in finding they had failed to meet the burden of proof because of failure to definitely describe the land so it could be definitely located. We overlooked the fact that in the face of this proof that the chancellor had disregarded it in granting the relief prayed for in the cross bill. It is elemental that the burden of proof was upon the appellees to prove that they owned all the land in dispute, including the 27 acres, before the chancellor would be justified in cancelling appellants' claim to the land. This they failed to do, for the reason the proof shows appellants had acquired titled to this portion of property by adverse possession. The fact that it was not definitely described by metes and bounds description does not give appellees title to the land. The aerial photographs clearly show where this property is located, and it would be no difficult task to have a surveyor locate and describe the land. Under the state of proof in this case the chancellor was not justified in cancelling the claim of appellants to that portion of the land that they had acquired title to by adverse possession.

For the reasons stated, I am of the opinion we should sustain the suggestion of error and reverse this case. However, if we do not go that far, we certainly should at very least sustain the suggestion of error in part so as to reverse that part of the decree that cancelled the claim of appellants to the 27 acres that they have cultivated these many years under claim of ownership. In my opinion the decision in this case results in a miscarriage of justice and does not do equity.

Suggestion of error overruled, by *Lee, C. J., and Jones, Brady, Patterson and Smith, JJ.; Rodgers and Inzer, JJ.,* dissent; *Ethridge, P. J.,* concurs in part and dissents in part; *Gillespie, J.,* took no part.

RODGERS, J., dissenting, On Suggestion of Error:

This case has been presented to the conference repeatedly and much study has been devoted to this very difficult statement of facts, nevertheless, I am convinced we have reached the wrong conclusion. I agree with the dissenting opinion of Judge Inzer for the following reasons: (1) Assuming there was an imperceptible movement of the creek from the east to the west and that such movement was a gradual accretion, rather than a sudden avulsion, the evidence, in my humble opinion, shows otherwise, obviously such accretion occurred long before the parties purchased the land west of the creek. Their deed described definite points in the northwest and southwest corners of their lots, and was the same description previously given to this land in other deeds before the creek moved. This, in my judgment, establishes a claim by color of title to all of the lands described in their deeds, at the time they went into possession, without regard to where the creek was located at the time the deeds were made. They occupied and used twenty-seven acres of land east of the creek and therefore were entitled to all of the lands described within the calls of their deed because of their adverse claim to a

part of the property, thus occupied. (2) Again assuming that there was sufficient evidence to establish that there was an accretion by the creek from east to west after the parties became riparian proprietors of the land to the west, nevertheless, it is shown by overwhelming evidence that the owners of the land on the west used, occupied and claimed twenty-seven acres east of the creek and there can be no reasonable dispute as to the fact that they used and occupied this twenty-seven acres longer than was necessary to establish a claim by adverse possession to the land. But, said the landowner to the east, they did not claim adverse possession to twenty-seven acres, nor did they prove the description or area of land used east of the creek. The answer to that argument is obvious. The twenty-seven acres were shown by aerial photograph, from which actual metes and bounds description was easily obtainable. Moreover, the title was divested from the western riparian proprietors upon a cross bill filed by the eastern riparian proprietor, and the burden was upon the cross-complainants to show they obtained title by accretion — not avulsion — to all of the lands claimed to have been obtained by accretion. 56 Am. Jur. *Waters* § 487 (1947). The facts show beyond question that the eastern landowner never had possession of the twenty-seven acres used by the western riparian proprietor.

In either case, we should have reversed the trial court. I am of the opinion that the western landowner was entitled to all of his land up to the eastern boundary as shown by the calls of the description in his deed. Failing in this argument, he was certainly entitled to the lands he adversely occupied for more than ten years.

I join in this dissent to hold up a flag to the trial courts, so that they as well as the appellate court may be reminded that the taking of property from one landowner and giving it to another, is not only fraught with danger of injustice, but the court should be very cautious

in using a legal fiction as a tool to divest property owners of title to their land. I believe the Suggestion of Error should be sustained.

ETHRIDGE, J., concurring in part and dissenting in part:

I concur in most of the points decided in the controlling opinion previously rendered. 253 Miss. 602, 176 So. 2d 307 (1965). This dissent concerns only the relatively small tracts on the east side of Second Creek which have been adversely possessed by appellants for many years, as everyone agrees the record shows.

The chancery court was justified in finding that there was accretion to appellees' land, and the right to such accretions vested in them. Nor can appellants claim the benefit of the doctrine of color of title, since the location of Second Creek in 1885 was not established, and therefore the partition decree, which appellants assert constituted color of title, was inadequate for that purpose.

However, the evidence establishes, as the controlling opinion recognizes, that appellants and their predecessors in title have used and adversely possessed between six and twenty-seven acres across the creek for many years, by cultivating it, gathering firewood, and selling timber. Although the bill of complaint did not request expressly an adjudication of ownership of the land actually, adversely possessed, the chancery court had the power and the duty, under general allegations of the bill, to so find and decide. It should have done so, and in my view, the suggestion of error should be overruled in part and sustained in part, and the cause remanded for a limited purpose: To determine the boundaries of the land of which appellants have been in actual adverse possession for more than the statutory ten years.

This result would be in accord with the plain facts and would effectuate an equitable decision. It would be consistent with the duty of the chancery and this Court to "remand the case to the files," or to remand it to

the trial court for determination of appropriate facts necessary to an equitable decision. See Williams v. Edwards, 246 Miss. 92, 149 So. 2d 326 (1963); Griffith, Miss. Chancery Practice § 595 (2d ed. 1950). This is the aim of judicial administration. The non-existence of direct precedents on this point should not prevent the use of a reasonable method of effectuating justice. On the contrary, it indicates the need for such an appropriate procedure.

Appellants have shown actual, continuous, adverse possession of a small portion of the entire tract in litigation. It should be the duty of the chancery court, after hearing appropriate evidence, to identify that tract and to recognize appellants' title to it.